[952 NE2d 995, 929 NYS2d 3]

Centro Empresarial Cempresa S.A. et al., Appellants, v América Móvil, S.A.B. de C.V., et al., Respondents.

Argued April 27, 2011; decided June 7, 2011

270

POINTS OF COUNSEL

*Fox Horan & Camerini LLP*, New York City (*Kathleen M. Kundar, JooYun Kim* and *Jennifer A. Fischer* of counsel), for appellants. I. In dismissing the complaint, the Appellate

Division majority committed reversible error when it concluded that plaintiffs had not alleged any basis for voiding the release they had granted defendants. (*Bloss v Va'ad Harabonim of Riverdale*, 203 AD2d 36; *Littman v Magee*, 54 AD3d 14; *Lobel v Maimonides Med. Ctr.*, 39 AD3d 275; *Anger v Ford Motor Co., Dealer Dev.*, 80 AD2d 736; *Newin Corp. v Hartford Acc. & Indem. Co.*, 37 NY2d 211; *Farber v Breslin*, 47 AD3d 873; *Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403; *H.W. Collections v Kolber*, 256 AD2d 240; *Madison Hudson Assoc. LLC v Neumann*, 44 AD3d 473; *Birnbaum v Birnbaum*, 73 NY2d 461; *Meinhard v Salmon*, 249 NY 458.) II. The issues argued at the Appellate Division as to dismissing the complaint on grounds other than the release should be decided in favor of plaintiffs consistent with the opinion of the dissenting Justices. (*Selinger Enters., Inc. v Cassuto*, 50 AD3d 766; *First Bank of Ams. v Motor Car Funding*, 257 AD2d 287; *Mañas v VMS Assoc., LLC*, 53 AD3d 451; *Rich v New York Cent. & Hudson Riv. R.R. Co.*, 87 NY 382; *Albemarle Theatre v Bayberry Realty Corp.*, 27 AD2d 172; *M & T Bank Corp. v Gemstone CDO VII, Ltd.*, 23 Misc 3d 1105[A], 2009 NY Slip Op 50590[U]; *Mandelblatt v Devon Stores*, 132 AD2d 162; *Zumpano v Quinn*, 6 NY3d 666; *General Stencils v Chiappa*, 18 NY2d 125; *Century Fed. Sav. & Loan Assn. of Long Is. v Net Realty Holding Trust*, 87 AD2d 858.)

*Mayer Brown LLP* (*Donald M. Falk* of the California bar, admitted pro hac vice, of counsel), *Mayer Brown LLP*, New York City (*Philip Allen Lacovara* and *Scott A. Chesin* of counsel), *Mayer Brown LLP*, Houston, Texas (*Steven R. Selsberg* of counsel), and *Mayer Brown LLP*, Chicago, Illinois (*Timothy S. Bishop* and *Joshua D. Yount* of counsel), for respondents. I. Plaintiffs released all of their claims. (*Troy News Co. v City of Troy*, 167 AD2d 730; *Ingram Corp. v J. Ray McDermott & Co., Inc.*, 698 F2d 1295; *Erie Telecoms., Inc. v City of Erie, Pa.*, 853 F2d 1084; *Henslee v Houston*, 566 F2d 475; *RBS Holdings, Inc. v Wells Fargo Century, Inc.*, 485 F Supp 2d 472; *Cardiovascular Diagnostics Inc. v Boehringer Mannheim Corp.*, 985 F Supp 615; *Booth v 3669 Delaware*, 92 NY2d 934; *Mangini v McClurg*, 24 NY2d 556; *Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603; *Matter of Schaefer*, 18 NY2d 314.) II. If not released, plaintiffs' claims nonetheless fail as a matter of law. (*Matter of 166 Mamaroneck Ave. Corp. v 151 E. Post Rd. Corp.*, 78 NY2d 88; *Arcadian Phosphates, Inc. v Arcadian Corp.*, 884 F2d 69; *Tonkery v Martina*, 78 NY2d 893; *Cobble Hill Nursing Home v Henry & Warren Corp.*, 74 NY2d 475; *Joseph Martin, Jr., Delicatessen v Schumacher*, 52 NY2d 105; *Saint Regis Paper Co.*

*v Hubbs & Hastings Paper Co.*, 235 NY 30; *United Press v New York Press Co.*, 164 NY 406; *Demisay v Allied Clove Lakes Co.*, 91 AD2d 1032; *Marinas of the Future v City of New York*, 87 AD2d 270; *Willmott v Giarraputo*, 5 NY2d 250.) III. Most of the causes of action must be dismissed on additional grounds. (*Krantz v Chateau Stores of Canada*, 256 AD2d 186; *Tesoro Petroleum Corp. v Holborn Oil Co.*, 108 AD2d 607; *Bridgestone/Firestone, Inc. v Recovery Credit Servs., Inc.*, 98 F3d 13; *New York Univ. v Continental Ins. Co.*, 87 NY2d 308; *Stangel v Zhi Dan Chen*, 74 AD3d 1050; *McGee v J. Dunn Constr. Corp.*, 54 AD3d 1010; *Mañas v VMS Assoc., LLC*, 53 AD3d 451; *Selinger Enters., Inc. v Cassuto*, 50 AD3d 766; *Old Clinton Corp. v 502 Old Country Rd.*, 5 AD3d 363; *Skillgames, LLC v Brody*, 1 AD3d 247.)

## OPINION OF THE COURT

CIPARICK, J.

Plaintiffs claim they were fraudulently induced to sell their ownership interests in a company they co-owned with one of the defendants, and to release defendants from claims arising out of that ownership. We affirm the Appellate Division's determination that this action is barred by the release.

Plaintiffs Centro Empresarial Cempresa S.A. (Centro) and Conecel Holding Limited (CHL) allege they once owned substantial shares of an Ecuadorian telecommunications company, defendant Consorcio Ecuatoriano de Telecomunicaciones S.A. Conecel (Conecel). The complaint alleges that, in 1999, they approached defendant Carlos Slim Helú (Slim), the "moving force behind" defendant Teléfonos de México, S.A. de C.V. (Telmex México), which owned defendant AMX Ecuador LLC, then known as Telmex Wireless LLC (Telmex), about the possibility of Telmex investing in Conecel.

Through a "Master Agreement" executed in March 2000, Telmex obtained a 60% indirect interest in Conecel, while plaintiffs each retained a minority interest, all held through a new entity, defendant Telmex Wireless Ecuador LLC (TWE). In exchange for its interest, Telmex contributed $150 million to TWE and paid CHL $35 million to cancel Conecel debts. The parties simultaneously entered into various other agreements. Under the "Limited Liability Company Agreement," the members of TWE agreed that Telmex would manage accounting, tax, and record-keeping for TWE, and that TWE would provide quarterly financial statements to all its members. In the

"Agreement Among Members," the members of TWE agreed that if Telmex ever consolidated—or "rolled up"—its Latin American telecommunications interests into a single entity "for purposes of selling the equity securities of such entity in international capital markets" at a time when plaintiffs owned 5% or more of TWE, plaintiffs could "negotiate in good faith (for a period not to exceed 20 days)" to exchange their TWE units for equity shares in the new company "at a mutually satisfactory rate of exchange." The Agreement also stated that, prior to any roll-up, Telmex and TWE would provide "financial, accounting and legal information with respect to Conecel and [TWE] as may reasonably be requested." A fourth agreement, the "Put Agreement," gave plaintiffs the right to require Telmex to purchase plaintiffs' TWE units at a set "floor price" during three separate 180-day periods between March 2002 and March 2006. Plaintiffs could exercise these put options for up to 50% of their units during the 2002 period; up to 75% during the 2004 period; and up to 95% during the 2006 period.

In September 2000, Telmex México formed defendant América Móvil, S.A.B. de C.V. (América Móvil), which became the holding company for several entities, including TWE. Plaintiffs allege that, under the Agreement Among Members, this triggered their right to negotiate an exchange of their TWE units for shares in América Móvil. They allege that in March 2001 they asked defendant Daniel Hajj Aboumrad (Hajj), Slim's son-in-law and CEO of América Móvil, for financial information about Conecel and TWE for use in the contemplated negotiations. Plaintiffs assert that they never received the information, despite repeated requests. They also allege that throughout 2001 Hajj falsely represented that Conecel was financially weak and had not generated any profits to distribute to TWE.

At this point, the complaint states, plaintiffs were "wary of the threat that Defendants would never negotiate in good faith and would never distribute the Conecel profits . . . as agreed." Thus left with "no practical alternative," plaintiffs exercised the first put option in March 2002 and sold Telmex 50% of their TWE units, the maximum number allowed in the first 180-day period, for which the put agreement entitled them to over $66 million. Over the next year, plaintiffs allege that they repeatedly attempted to open exchange negotiations, but defendants refused to negotiate. In 2003, defendants provided Conecel's balance sheet, which indicated that the company was not doing well, and made further representations to that effect.

In 2003, Telmex offered to purchase plaintiffs' remaining units at the floor price, and plaintiffs—allegedly relying on the false financial information—agreed, entitling them to additional substantial consideration. In July 2003, plaintiffs entered a Purchase Agreement with América Móvil, AM Wireless, LLC (formerly Telmex), and Wireless Ecuador LLC (formerly TWE). The parties executed various releases in connection with the sale. In the "Release for Agreement Among Members" (Members Release), the sellers released Telmex and its affiliates, shareholders, and agents from

> "all manner of actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands, liability, whatsoever, in law or equity, whether past, present or future, actual or contingent, arising under or in connection with the Agreement Among Members and/or arising out of, based upon, attributable to or resulting from the ownership of membership interests in [TWE] or having taken or failed to take any action in any capacity on behalf of [TWE] or in connection with the business of [TWE]."

A second release, the "Release for Master Agreement" (Master Release), employed nearly identical language, but added a proviso. It released the Telmex-related parties from claims,

> "relating to (A) the ownership by the Telmex Released Parties of the [TWE] Units, or (B) any matter arising under or in connection with the Master Agreement, or any other document, agreement, instrument related thereto or executed in connection therewith . . . provided that the foregoing release shall not release any claims involving fraud."

In June 2008, plaintiffs commenced this action against Telmex México and several of its affiliates: América Móvil, AMX Ecuador (formerly Telmex), Wireless Ecuador LLC (formerly TWE), Conecel, Slim, and Hajj. The complaint asserts 12 causes of action for, among other things, breach of contract, breach of fiduciary duty, fraud, and unjust enrichment. The crux of plaintiffs' claim is that defendants failed to provide them with accurate tax and financial statements for Conecel and were unwilling to negotiate in good faith for a share exchange.

Plaintiffs allege that they only discovered that defendants supplied them with fraudulent information in 2008, after the Ecuadorian government audited Conecel and released the results. They seek a minimum of $900,000,000 in damages—the amount they claim they would have made if a good faith share exchange had been accomplished under the terms of the Members Agreement—plus interest.

Defendants moved to dismiss the complaint on several grounds, including that a defense is founded on documentary evidence (*see* CPLR 3211 [a] [1]) and the action is barred by a release (*see* CPLR 3211 [a] [5]). Supreme Court, ruling from the bench, denied the motion.

The Appellate Division reversed and granted the motion to dismiss, holding that plaintiffs' claims, "are barred by the general release they granted defendants in connection with the sale of their interest" (*Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 76 AD3d 310, 311 [1st Dept 2010]). After finding that the release "includes any claim possibly to be discovered in the future that defendants had misrepresented the value of Conecel" (*id.* at 317), the court concluded that the release was not fraudulently induced, since plaintiffs failed to allege any fraud "separate and distinct" from that contemplated by the release (*id.* at 317-318). That Telmex, as the majority shareholder, owed plaintiffs a fiduciary duty did not alter the court's analysis. Further, the court noted, plaintiffs were allegedly aware that they lacked a full picture of Conecel's internal finances and that the relationship between the parties had become adversarial, yet they failed to condition the release on the truth of the information supplied by defendants, obtain representations or warranties to that effect, or insist on viewing additional information.

Two justices dissented on the ground that the release was fraudulently induced, since plaintiffs did not realize the depths of the alleged fraud and a fiduciary cannot be released from liability unless it has fully disclosed its tortious conduct (*see id.* at 329 [Catterson, J., dissenting]). The dissent emphasized that the complaint does not allege that plaintiffs had knowledge of defendants' fraud, and plaintiffs were "reasonably justified in their expectations that the defendants," as fiduciaries, "would disclose any information in their possession that might affect plaintiffs' decision on their best course of action" (*id.* at 330). Moreover, in the dissent's view, the release did not "mention[ ] or contemplate[ ]" fraud claims (*id.* at 331). Plaintiffs appealed as of right pursuant to CPLR 5601 (a).

Plaintiffs argue that, as the Appellate Division dissent found, the Members Release was not intended to reach fraud claims. They further contend that the release itself was fraudulently induced, particularly in light of the parties' fiduciary relationship, and that their reliance on defendants' financial disclosures was justified.

Generally, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release" (*Global Mins. & Metals Corp. v Holme*, 35 AD3d 93, 98 [1st Dept 2006]). If "the language of a release is clear and unambiguous, the signing of a release is a 'jural act' binding on the parties" (*Booth v 3669 Delaware*, 92 NY2d 934, 935 [1998], quoting *Mangini v McClurg*, 24 NY2d 556, 563 [1969]). A release "should never be converted into a starting point for . . . litigation except under circumstances and under rules which would render any other result a grave injustice" (*Mangini*, 24 NY2d at 563). A release may be invalidated, however, for any of "the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake" (*id.*).

Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release "shifts the burden of going forward . . . to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release" (*Fleming v Ponziani*, 24 NY2d 105, 111 [1969]). A plaintiff seeking to invalidate a release due to fraudulent inducement must "establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury" (*Global Mins.*, 35 AD3d at 98).

Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is "fairly and knowingly made" (*Mangini*, 24 NY2d at 566-567; *Alleghany Corp. v Kirby*, 333 F2d 327, 333 [2d Cir 1964]). As the Appellate Division majority explained below (*Centro*, 76 AD3d at 318), a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release (*see Bellefonte Re Ins. Co. v Argonaut Ins. Co.*, 757 F2d 523, 527-528 [2d Cir 1985]). Were this not the case, no party could ever settle a fraud claim with any finality.

■ As a preliminary matter, the parties here debate whether the Members Release encompasses unknown fraud claims. We find that it does. The broad language of the release reaches "all manner of actions . . . whatsoever . . . whether past, present or future, actual or contingent, arising under or in connection with the Agreement Among Members and/or arising out of . . . the ownership of membership interests in [TWE]." The phrase "all manner of actions," in conjunction with the reference to "future" and "contingent" actions, indicates an intent to release defendants from fraud claims, like this one, unknown at the time of contract (*see Ingram Corp. v J. Ray McDermott & Co., Inc.*, 698 F2d 1295, 1312 [5th Cir 1983]; *Consorcio Prodipe, S.A. de C.V. v Vinci, S.A.*, 544 F Supp 2d 178, 192 [SD NY 2008]).

Plaintiffs note that the Master Release, executed at the same time as the Members Release, is substantially similar but expressly excludes fraud claims. They argue—apparently for the first time in their briefs before us—that the fraud exception in the Master Release should be read into the Members Release. Even assuming we can reach this argument (*see Matter of SoHo Alliance v New York City Bd. of Stds. & Appeals*, 95 NY2d 437, 442 [2000]), "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include" (*Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 72 [1978]). We see no reason to import the Master Release's express statement into the Members Release. If anything, the explicit exclusion of fraud claims from the Master Release suggests that the Members Release is not so limited. Plaintiffs' claims are either brought under the Agreement Among Members, under which Telmex agreed to negotiate in good faith and provide Conecel and TWE's financial information, or otherwise "aris[e] out of" their "ownership of membership interests in [TWE]." They therefore fall under the Members Release.

■ Having executed this release, plaintiffs cannot now claim that defendants fraudulently misled them regarding the value of their ownership interests in TWE unless the release was itself induced by a separate fraud. The fraud described in the complaint, however, falls squarely within the scope of the release: plaintiffs allege that defendants supplied them with false financial information regarding the value of Conecel and TWE, and that, based on this false information, plaintiffs sold their interests in TWE and released defendants from claims in connection with that sale. Thus, as the Appellate Division

observed: "plaintiffs seek to convert the 2003 release into a starting point for new . . . litigation, essentially asking to be relieved of the release on the ground that they did not realize the true value of the claims they were giving up" (*Centro*, 76 AD3d at 317).

That the parties had a fiduciary relationship does not alter our conclusion. It is true that Telmex, as a majority shareholder in a closely held corporation, owed a fiduciary duty to plaintiffs, minority shareholders (*see Fender v Prescott*, 64 NY2d 1077, 1079 [1985]). Telmex was therefore required to "disclose any information that could reasonably bear on plaintiffs' consideration of [its purchase] offer" (*Dubbs v Stribling & Assoc.*, 96 NY2d 337, 341 [2001]).

██ A sophisticated principal is able to release its fiduciary from claims—at least where, as here, the fiduciary relationship is no longer one of unquestioning trust—so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into (*see Alleghany Corp.*, 333 F2d at 333 ["There is no prerequisite to the settlement of a fraud case that the (fiduciary) defendant must come forward and confess to all his wrongful acts in connection with the subject matter"]; *Consorcio Prodipe, S.A. de C.V.*, 544 F Supp 2d at 191). To the extent that Appellate Division decisions such as *Littman v Magee* (54 AD3d 14, 17 [1st Dept 2008]), *Blue Chip Emerald v Allied Partners* (299 AD2d 278, 279-280 [1st Dept 2002]) and *H.W. Collections v Kolber* (256 AD2d 240, 241 [1st Dept 1998]) suggest otherwise, they misapprehend our case law. Plaintiffs here are large corporations engaged in complex transactions in which they were advised by counsel. As sophisticated entities, they negotiated and executed an extraordinarily broad release with their eyes wide open. They cannot now invalidate that release by claiming ignorance of the depth of their fiduciary's misconduct.

██ In addition to failing to allege that the release was induced by a separate fraud, plaintiffs have failed to allege that they justifiably relied on defendants' fraudulent statements in executing the release. As we recently reiterated:

> "[I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he

must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations" (*DDJ Mgt., LLC v Rhone Group L.L.C.*, 15 NY3d 147, 154 [2010], quoting *Schumaker v Mather*, 133 NY 590, 596 [1892]).

Here, according to the facts alleged in the complaint, plaintiffs knew that defendants had not supplied them with the financial information necessary to properly value the TWE units, and that they were entitled to that information. Yet they chose to cash out their interests and release defendants from fraud claims without demanding either access to the information or assurances as to its accuracy in the form of representations and warranties. In short, this is an instance where plaintiffs "have been so lax in protecting themselves that they cannot fairly ask for the law's protection" (*id.* at 154).

In certain circumstances, a fiduciary's disclosure obligations might effectively operate like a written representation that no material facts are undisclosed, and this might satisfy a principal's obligation to investigate further (*see id.* at 154-155). Where a principal and fiduciary are sophisticated parties engaged in negotiations to terminate their relationship, however, the principal cannot blindly trust the fiduciary's assertions. This is particularly true where, as alleged here, the principal has actual knowledge that its fiduciary is not being entirely forthright: "[W]hen the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it. It cannot reasonably rely on such representations without making additional inquiry to determine their accuracy" (*Global Mins.*, 35 AD3d at 100 [citations omitted]; *see also Littman*, 54 AD3d at 17 [if the fiduciary is "aware of information that rendered (its) reliance unreasonable, or if (it) had enough information to create a duty to investigate further, the requisite reliance cannot be established"]).

Plaintiffs repeatedly and unsuccessfully attempted to hold defendants to their disclosure obligations for years before negotiating and executing the sale of their shares and the accompanying releases. Moreover, the complaint alleges that plaintiffs were driven to sell because they were "wary of the threat that Defendants would never negotiate in good faith and would never distribute the Conecel profits." Plaintiffs therefore cannot be said to have reasonably relied on defendants' assertions regarding Conecel's performance in executing the releases.

In sum, the 2003 Members Release was intended to bar the very claims that plaintiffs now bring, and plaintiffs fail to allege that the release was induced by any fraud beyond that contemplated by the release. In any event, the fraudulent statements plaintiffs point to cannot support a conclusion that the release was fraudulently induced, since plaintiffs allege that they released defendants from claims relating to the sale of their TWE units without conducting even minimal diligence to determine the true value of what they were selling. The Appellate Division majority was therefore correct in concluding that, fully crediting plaintiffs' allegations, they would not be able to prevail as a matter of law.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order affirmed, with costs.