LMM Capital Partners, LLC v Mill Point Capital, LLC (2024 NY Slip Op 00806)

LMM Capital Partners, LLC v Mill Point Capital, LLC

2024 NY Slip Op 00806

Decided on February 15, 2024

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: February 15, 2024

Before: Manzanet-Daniels, J.P., Oing, Kapnick, Shulman, Pitt-Burke, JJ. 

Index No. 653606/22 Appeal No. 1660 Case No. 2023-03088 

[*1]LMM Capital Partners, LLC, Plaintiff-Appellant,
v
Mill Point Capital, LLC, et al., Defendants-Respondents.

Schlam Stone & Dolan LLP, New York (Samuel L. Butt of counsel), for appellant.
Schulte Roth & Zabel LLP, New York (Julia M. Beskin of counsel), for Mill Point Capital, LLC and E&M Logistics, Inc., respondents.
Hochheiser Akmal PLLC, Garden City (Marc Sabow of counsel), for Martin Kelly, respondent,

Order, Supreme Court, New York County (Barry R. Ostrager, J.), entered on or about May 10, 2023, which granted defendants' motions to dismiss the complaint with prejudice pursuant to CPLR 3211(a)(1), (5), and (7), unanimously affirmed, with costs.
In early 2020, plaintiff LMM Capital Partners, LLC (LMM), a private equity firm, and defendant Martin Kelly (Kelly), the CEO and majority owner of defendant E&M Logistics, Inc. (E&M), a leading distributor of food and beverages, began discussing and negotiating plaintiff's acquisition of E&M. As part of the negotiation process, plaintiff and E&M entered into a Letter of Intent (LOI). The LOI provided, among other things, that should E&M elect not to close the transaction for any reason, it would pay a "breakup fee" to plaintiff in the amount of $400,000.00. During the negotiation process with E&M, plaintiff sought an investment partner with which it could complete the transaction. Plaintiff narrowed its search down to two other private equity firms, nonparty Tenex Capital Management (Tenex) and defendant Mill Point Capital LLC (Mill Point). During the search, Mill Point and plaintiff entered into a Non-Circumvention Agreement (NCA) in which Mill Point agreed to not pursue the acquisition of E&M, for a certain period of time, on its own. In other words, the potential deal belonged to plaintiff and Mill Point was not to usurp it.
Ultimately, plaintiff selected Tenex and moved forward with the transaction. Less than one month later, Kelly told plaintiff's managing partner, Elisha Aharon (Aharon) that Kelly would like to terminate all negotiations with plaintiff and pay the breakup fee. Kelly also informed Aharon that E&M's two largest vendors, nonparties Nestle and Froneri, would not approve the sale of E&M to any private equity fund. Aharon attempted to dissuade Kelly and asked to speak to someone at Nestle and Froneri to assure them that LMM and Tenex were the right ones for the deal. Kelly declined to arrange such a meeting. A few days later E&M's attorney sent a Mutual Termination Agreement and Release to Aharon. Both Aharon, on behalf of LMM, and Kelly, on behalf of E&M, executed the release which terminated the LOI and provided that E&M would pay plaintiff a total of $420,000.00. Pursuant to the agreement, plaintiff released:
"Company [E&M] and each of the Company Released Parties (as defined below), from and against any and all manner of actions, causes of action, suits, proceedings, claims, demands, damages, rights, liens, agreements, contracts, covenants, obligations, debts, dues, sums of money, costs, expenses, reasonable attorneys' fees, judgements, orders, and liabilities (the foregoing are hereinafter collectively referred to as the "Damages") of whatsoever kind and nature, whether based on tort (including, without limitation, acts of negligence), contract or any other theory of recovery, whether at law or in equity or otherwise, whether known or unknown, liquidated or unliquidated[*2], suspected or unsuspected and whether or not concealed or hidden, which LMM and/or LMM Released Parties had, now has, or hereafter may have against the Company and/or any or all of the Company Released Parties arising out of, relating to, connected with, or incidental to, the Letter of Intent or the transaction contemplated thereby."
The Termination Agreement defined "Company Released Parties" as,
"(a) the Company's past, present and future Affiliates (as defined below); (b) the Company's and the Company's Affiliates' predecessors, successors, and assigns; and (c) the directors, officers, members, managers, shareholders, employee stock ownership plan, partners, financing and equity sources, trustees, supervisors, employees, agents, and representatives of each Party included within (a) and (b) immediately above." Affiliates was defined as "with respect to a Party, an entity which, directly or indirectly, controls, is controlled by, or is under common control with such Party."
Less than two months after signing the Termination Agreement, Aharon learned that Mill Point was pursuing E&M. A mere three months later, E&M and Mill Point announced that Mill Point had acquired E&M for $80 Million, which was six million more than LMM had offered.
Soon thereafter, plaintiff commenced this action, alleging breach of the NCA and tortious interference with plaintiff's business relations against Mill Point; tortious interference with contract and constructive fraud against Kelly and E&M; and fraudulent inducement against Kelly and E&M. Plaintiff also sought a declaration that the Termination Agreement and release are unenforceable. Defendants moved to dismiss the complaint pursuant to CPLR 3211(a)(1), (5), and (7). Supreme Court granted defendants' motion, with prejudice.
This case turns on the release and whether plaintiff's claim for fraudulent inducement falls outside the scope of that release. First, and contrary to plaintiff's contention, a court can decide, on a CPLR 3211 motion, if a release was fraudulently induced (see e.g. Centro Empresarial Cempresa S.A. v AmÉrica MÓvil, S.A.B. de C.V., 17 NY3d 269, 275 [2011]). Unlike Gonzalez v 40 W. Burnside Ave. LLC (107 AD3d 542 [1st Dept 2013]) and other precedents cited by plaintiff, the case at bar does not involve a personal injury. Moreover, Gonzalez said, "Under the particular facts of this case, dismissal . . . was premature" (id. at 544).
"Generally, 'a valid release constitutes a complete bar to an action on a claim which is the subject of the release'" (Centro, 17 NY3d at 276, quoting Global Mins. & Metals Corp. v Holme, 35 AD3d 93, 98 [1st Dept 2006], lv denied 8 NY3d 804 [2007]). In fact, "a release may encompass unknown claims, including unknown fraud claims" (Centro 17 NY3d at 276). However, if the release was obtained under duress, through illegality, fraud or mutual mistake, it may be invalidated, a burden which is borne by the party seeking to set aside the release (Centro 17 NY3d at [*3]276). And the party seeking to set aside the release "may later challenge that release as fraudulently induced only if it can identity a separate fraud from the subject of the release" (id.; Silver Point Capital Fund, L.P. v Riviera Resources, Inc., 198 AD3d 432, 433 [1st Dept 2021]). To allow anything less would undermine a party's ability to settle a fraud claim with finality (Centro at 276).
Here, the broad release encompassed fraud claims, both known and unknown, suspected and unsuspected, which plaintiff had, now had or hereafter may have. Plaintiff alleges in the complaint that "E&M and Kelly knowingly falsely stated to LMM that Nestle and Froneri would never enter into a deal with a private equity firm or fund" and that they did so "with an intent to cause LMM to enter into the Termination Agreement under false pretenses and to stop pursuing the E&M deal. . ." These allegations arise out of, relate to, are connected with or incidental to the transaction contemplated by the LOI, claims which plaintiff explicitly released when it signed the Termination Agreement. Thus, the fraud described by plaintiff "falls squarely within the scope of the release" and is an attempt to convert the release into a starting point for litigation, which is impermissible (id.).
In further support of its argument that it was fraudulently induced into signing the Termination Agreement, plaintiff contends that it justifiably relied on Kelly and E&M's misrepresentations. ACA Fin. Guar. Corp. v Goldman, Sachs & Co. (25 NY3d 1043 [2015]) provides that "the question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss" (id. at 1045). However, ACA did not involve a release. By contrast, in cases involving releases, the Court of Appeals has decided as a matter of law that plaintiffs failed to allege justifiable reliance (see Centro, 17 NY3d at 278; Arfa v Zamir, 17 NY3d 737, 739 [2011]).
"When the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it. It cannot reasonably rely on such representations without making additional inquiry to determine their accuracy" (Centro, 17 NY3d at 279 [brackets and internal quotation marks omitted]). Plaintiff had hints that Kelly's representation that Nestle and Froneri would not approve of a private equity buyer for E&M were false. First, Kelly had previously informed plaintiff that Nestle and Froneri had approved the deal with plaintiff. Second, plaintiff knew that Nestle had sold a majority stake in its U.S. ice cream business to a private equity firm in 2019, so it knew that Nestle did not always disapprove of private equity buyers.
"When a party fails to make further inquiry or insert appropriate language in the agreement for its protection, it has willingly assumed the business risk that the facts may not be as represented" (Global Mins. & Metals Corp. v Holme, 35 AD3d at 100). Plaintiff [*4]"should have sought to condition the settlement on the truth of the representations by [Kelly/E&M] that induced [plaintiff] to enter the settlement" (id. at 101).
Nor does the special facts doctrine save plaintiff's claims. That "doctrine requires satisfaction of a two-prong test: that the material fact was information peculiarly within the knowledge of one party and that the information was not such that could have been discovered by the other party through the exercise of ordinary intelligence" (Greenman-Pedersen, Inc. v Berryman & Henigar, Inc., 130 AD3d 514, 516 [1st Dept 2015], lv denied 29 NY3d 913 [2017]). Plaintiff fails to satisfy that test: the fact that nonparties Nestle and Froneri would actually allow a private equity fund to buy E&M was not peculiarly within the knowledge of E&M and there was nothing stopping plaintiff from contacting Nestle and Froneri directly. Plaintiff's claims on appeal that Kelly precluded it from having contact information for Nestle and Froneri and that its October 2020 call with a Nestle Vice President was not with a decision maker are not supported by the record (see Chimarios v Duhl, 152 AD2d 508, 509 [1st Dept 1989]).
In sum, the motion court properly dismissed the fourth through sixth causes of action, which seek to invalidate the release.
Plaintiff contends that, even if the release is valid, it should not cover Mill Point because plaintiff did not intend to release that defendant. This argument is unavailing. If — as here — the language of the release "is unmistakably clear" (Matter of Schaefer, 18 NY2d 314, 317 [1966]), "[t]he fact that the [releasor] may have intended something else is irrelevant" (id.). Here, the release included Company Affiliates, which was defined as a party or entity that "directly or indirectly, controls, is controlled by, or is under common control with such" Company and Company Affiliates. Upon acquiring E&M, Mill Point was covered by the release as a Company Affiliate.
On the merits, plaintiff has failed to preserve the argument that Kelly is not a "Company Released Party." Even if plaintiff had made this argument in opposition to Kelly's motion, Kelly could have submitted evidence that he was a director, officer, or shareholder of the Company's affiliates and thus, covered by the release (cf. Vanship Holdings Ltd. v Energy Infrastructure Acquisition Corp., 65 AD3d 405, 408 [1st Dept 2009]).
Plaintiff's contention that the release did not cover conduct after its date is unavailing. The release covers any claims that plaintiff "hereafter may have."
In light of the determination that the release is valid and covers plaintiff's claims, plaintiff's remaining arguments are academic.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 15, 2024