Peckham Asphalt Resale Corp. v Gorman (2025 NY Slip Op 52063(U))

[*1]

Peckham Asphalt Resale Corp. v Gorman

2025 NY Slip Op 52063(U)

Decided on October 2, 2025

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 2, 2025
Supreme Court, Albany County

Peckham Asphalt Resale Corp., PECKHAM MATERIALS CORP., and PECKHAM RENSSELAER LLC, Plaintiffs,

against
Paul Anthony Gorman, ALBERT MARK GORMAN, GORMAN BROS., INC., THE CADY CO. INC., GORMAN ASPHALT, LTD., MOHAWK ASPHALT EMULSIONS, INC., GORMAN TERMINALS, LLC, and THE GORMAN GROUP, LLC, Defendants.

Index No. 901240-25

Couch White, LLP
Attorneys for Plaintiffs
(Donald J. Hillmann and Adrianne M. Meicht, of counsel)
540 Broadway, P.O. Box 22222
Albany, New York 12201-2222
Cullen & Dykman LLP
Attorneys for Defendants
(Christopher E. Buckey, Nicholas J. Faso and Kristen A. Davis, of counsel)
80 State Street, Suite 900
Albany, New York 12207
Gleason Dunn Walsh & O'Shea
Attorneys for Defendants
(Jack P. Calareso and Katy D. Bobel, of counsel)
300 Great Oaks Boulevard, Suite 321 
Albany, New York 12203

Richard M. Platkin, J.

This is an action by the purchasers of an asphalt business to recover damages for fraud and breach of warranty. The defendant-sellers move under CPLR 3211 (a) (1) and (7) for the pre-answer dismissal of claims predicated on alleged misrepresentations and concealments as to the availability of asphalt storage tanks on an adjacent property. Plaintiffs oppose the motion. 
BACKGROUND [FN1]

A. The Relevant Parties/Nonparties
Plaintiffs Peckham Asphalt Resale Corp., Peckham Materials Corp., and Peckham Rensselaer LLC (collectively, "Peckham") "are part of a 100 year old family of companies that provide . . . hot mix asphalt, warm mix asphalt, aggregates, and emulsions throughout eastern New York State and other parts of the northeast" (NYSCEF Doc No. 1 ["Complaint"], ¶ 21).
Defendants Gorman Bros., Inc., The Cady Co. Inc., Gorman Asphalt, Ltd., Mohawk Asphalt Emulsions, Inc., Gorman Terminals, LLC and The Gorman Group, LLC (collectively, "Gorman Group") are "a family of companies based in and around the Capital District" (id., ¶ 15). The Gorman Group's assets "included ownership and operation of a deep-water asphalt terminal facility at the Port of Rensselaer," along with "an asphalt emulsion-manufacturing plant, transportation facilities, and pavement preservation services" (id., ¶¶ 17-18). Defendants Paul Gorman and Albert Gorman (collectively, "the Gormans") were the "principal shareholders, members, and/or equity holders" of the Gorman Group (id., ¶ 16).
By Spring 2022, the Gormans had become interested in selling the assets of the Gorman Group (see id., ¶ 19). Potential purchasers included Peckham, along with non-parties All States Construction, Inc./All States Emulsions LLC (collectively, "All States") and Bitumar, Inc. and Bitumar USA, Inc. (collectively, "Bitumar") (see id., ¶ 20). All States is a Massachusetts business that was "initially focused on liquid asphalt product transportation and application," but later expanded "into the production of asphalt emulsions and the operation of asphalt distribution terminals" (id., ¶ 22). Bitumar is an asphalt supplier (see id., ¶¶ 23-24) that had "no meaningful presence in most of New York" prior to February 2024, and "[e]ven in the limited areas [of New York] . . . where Bitumar did make sales, it had no physical operational presence" (id., ¶¶ 28-29). 
FMI Corp. ("FMI") is a consulting and investment banking firm that served as defendants' "authorized agent for the purpose of negotiating purchase terms" (id., ¶¶ 34-35). Plaintiffs allege that FMI and its lead banker, George Reddin, had both "actual" and "apparent authority to represent Defendants and communicate on their behalf to Plaintiffs . . . concerning the price and terms of sale of the Gorman Group" (id., ¶¶ 37-38). 
Finally, the Gorman Group "was not the only entity with operations at the Port of Rensselaer. A third-party known as CHS, Inc./Cenex ('Cenex') owns additional storage tanks on the property sitting adjacent to the Gorman Group's tanks" (id., ¶¶ 48-49). 
B. The Asset Purchase Agreement
The assets of the Gorman Group first were put on the market in Spring 2022, and "All States was the successful initial bidder" (id., ¶¶ 30-31). However, despite one year of exclusive negotiations, they were unable "to reach final contracted terms, and the Gorman[s] once again [*2]reached out to . . . prospective bidders in September, 2023" (id., ¶¶ 31-32).
Although Peckham and All States "initially act[ed] as competitive bidders," they later agreed to join forces and "collectively purchase the Gorman Group's assets" (id., ¶ 33). 
"On November 21, 2023, [the Gorman Group, Peckham and All States] signed a letter of intent (the 'LOI') under which [Peckham] and All States expressed their intention to purchase collectively 100% of the assets of Defendants for $81 Million" (id., ¶ 39). "By its terms, the contents and subject matter of the LOI were confidential" (id., ¶ 40). The same parties also "entered into mutual confidentiality agreements under which each party was responsible for any disclosure of confidential information including by its employees" (id., ¶ 41).
On February 2, 2024, the parties to this action entered into an asset purchase agreement by which Peckham "acquired Defendants' asphalt operations, including but not limited to: (i) the deep water terminal and asphalt tanks at the Port of Rensselaer; and (ii) a wholesale business that blends, tests, and sells liquid asphalt cement to third-party construction companies" (id., ¶¶ 42-43; see also NYSCEF Doc No. 32 ["APA"]).[FN2]
"The APA was a 'sign and close' transaction, meaning the closing occurred on the day the APA was executed" (Complaint, ¶ 45). 
C. The Cenex Tanks
The terminal owned by the Gorman Group had "asphalt storage tanks capable of holding approximately 80,000 tons of liquid asphalt" (id., ¶ 46). "This terminal is strategically located, is accessible by both rail and water, and is a main hub for asphalt supply in Upstate New York and Western Massachusetts" (id., ¶ 47). 
Cenex owns an adjacent property with storage tanks "capable of holding approximately 30,000 tons of liquid asphalt" (id., ¶¶ 49, 52). "For years prior to the sale of assets, Defendants recognized the strategic and competitive value the Cenex tanks would add to the Gorman Group . . . , and considered leasing them" (id., ¶ 51). Control over the Cenex tanks "would have increased Gorman Group's [storage] capacity . . . by approximately 38%" and ensured the tanks were "unavailable to competitors" (id., ¶¶ 53-54). "In fact, . . . Defendants had engaged in substantial and meaningful negotiations with Cenex" regarding a lease of the tanks (id., ¶ 57). 
Although "the Gorman Group never finalized the lease terms with Cenex, [it] advised Plaintiffs on multiple occasions, directly and through . . . FMI, that the Cenex tanks were an open opportunity and that Plaintiffs could step into the Gorman Group's shoes post-closing to finalize the lease" (id., ¶ 58). 
In "September 2023, FMI (through Mr. Reddin) and Eric Belman (Plaintiffs' Vice President of Business Development) had multiple conversations in which the value of the Gorman Group's assets was discussed" (id., ¶ 62). "The availability of the Cenex tanks, and prospect of both growing the existing Gorman terminal business, as well as precluding the introduction of new competition . . . , were repeatedly touted by FMI . . . as a 'value add' growth opportunity," and "[s]imilar representations . . . were repeated to Plaintiffs by FMI . . . , as well as by Defendants themselves, on at least a half dozen occasions between September 2023 and the entry of the LOI in November 2023" (id., ¶ 68). "During these discussions, Defendants[] held themselves out as having special knowledge of the Cenex tanks, and their availability, based on [*3]the Gorman Group's prior recent lease negotiations" (id., ¶ 64). 
On November 30, 2023, "members of Defendants' senior management met in person with Plaintiffs to discuss the Gorman Group's assets and inspect the facility at the Port of Rensselaer (the 'November Inspection')" (id., ¶ 76). "During the meeting, Tony Gorman again raised the issue of the Cenex Tanks. He explained he had special knowledge about the tanks that was not publicly available, including the[ir] size, capacity, availability, and present usage" (id., ¶ 77). 
"As part of the November Inspection, Tony Gorman led a guided tour of the Gorman Group's . . . facilities. As Cenex tanks came into view, [he] pointed directly to them and declared them a 'growth opportunity'" (id., ¶¶ 80-81). He "further stated that the Cenex tanks were not being used for asphalt by any competitor, were available for lease from Cenex, and that control [thereof] would provide Plaintiffs with a strategic and competitive advantage" (id., ¶ 82). Other members of defendants' management, Edward House and Ben Scarcella, were present and "acknowledged the representations made by Tony Gorman with approval" (id., ¶ 83). 
Plaintiffs allege that the availability of the Cenex tanks "was a material consideration for Plaintiffs, and Defendants knew it" (id., ¶ 87). "As long time participants in the region's liquid asphalt market, Defendants knew that if the Cenex tanks were to fall into the hands of a competitor, it would materially decrease the value of the Gorman Group's assets" (id., ¶ 88). 
Plaintiffs further allege that defendants "made these representations for the purpose of inducing Plaintiffs into . . . the purchase of the Gorman Group's assets at an inflated price," and defendants "knew or should have known that Plaintiffs were relying upon these representations" (id., ¶¶ 84-85; see id., ¶¶ 69-72). Moreover, throughout the parties' negotiations, "Defendants never recanted their representations about the availability of the Cenex tanks" (id., ¶ 89). 
Despite defendants' representations, "and unbeknownst to Plaintiffs, the Cenex tanks were not actually available" (id., ¶ 90). "Defendants knew, prior to the Closing Date, that Bitumar . . . had taken steps to lease or acquire the Cenex tanks" (id., ¶¶ 91-92). 
Just one month following execution of the APA, "Bitumar publicly announced that it was entering the asphalt market in New York, Vermont, Massachusetts, Connecticut and New Jersey, through its 'new location' at the Port of Rensselaer" (id., ¶ 93). The announcement identified three former Gorman Group managers, Ed House, Ben Scarcella and Kim Wilson, as part of Bitumar's "new team" (id., ¶ 94). 
Plaintiffs maintain that the Gorman Group was aware of Bitumar's plans prior to the signing of the APA. At some point between the November 21, 2023 LOI and the February 2, 2024 APA, House, Scarella and Wilson, all "members of Gorman Group's management team[,] had laid plans to join Bitumar" (id., ¶¶ 95-96). And on November 15, 2023, just days prior to the execution of the LOI, "overhead maps of the Cenex tanks were exchanged in emails between Bitumar and the Gorman Group" (id., ¶ 99). 
"As the [APA c]losing date approached, the frequency of Defendants' discussions with Bitumar increased" (id., ¶ 101). "On December 11th, 14th, and 22nd 2023, Edward House, Ben Scarcella, Kimberly Wilson attended a series of meetings with Bitumar executives" (id.), which included discussion of Bitumar's "plan[] to acquire control over the Cenex tanks" (id., ¶ 103) and enter "the liquid asphalt market of the Northeastern United States" (id., ¶ 102). 
These three Gorman Group executives "knew that Plaintiffs were in the process of acquiring the assets of the Gorman Group," as they "were directly involved in the facilitation of Plaintiff's due diligence efforts on a near-daily basis" (id., ¶ 104). Along with defendants' CEO, Joseph Farone, these Gorman Group employees "were aware that . . . Bitumar's entry into the [*4]market was contingent" on acquisition of the Cenex tanks, and they also knew that "defendants "had made material representations to Plaintiffs concerning the availability of the Cenex tanks" (id., ¶¶ 103-107). "As officers and managers of the Gorman Group, the information known by [those employees] was imputed to the Gorman Group" (id., ¶ 106). 
Plaintiffs further allege that the Gormans "knew that Cenex was planning to lease the tanks to Bitumar" because "the entire sales management team, as well as the plant manager of the Gorman terminal itself, . . . planned to join Bitumar at its new location at the Port of Rensselaer after the Closing Date" (id., ¶¶ 108-109). Plaintiffs also cite a November 10, 2023 email to Tony Gorman from a senior manager "confirming a discussion [he] had with Cenex," in which the manager "learned that the Cenex tanks were 'off the table' because Cenex was engaged in negotiations with a third party," believed to be Bitumar (id., ¶¶ 112-113).
D. This Litigation
Plaintiffs commenced this action on January 31, 2025, seeking primarily to recover damages for defendants' alleged concealments and misrepresentations concerning the Cenex tanks under theories sounding in breach of warranty (first and second causes of action) and fraudulent inducement (fourth cause of action). Their alleged damages include, "without limitation, a decrease in value of Gorman Group's assets, the value of lost business opportunities, and the loss of proprietary trade secret information, in an amount . . . not less than $30,000,000" (id., ¶¶ 146, 154, 177).[FN3]
Defendants move to dismiss the claims concerning the Cenex tanks under CPLR 3211 (a) (1) and (7).[FN4]

DISCUSSION
On a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), a court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88 [1994]). "Dismissal . . . is warranted if the plaintiff fails to assert facts in support of an element of the claim, or if the factual allegations and inferences to be drawn from them do not allow for an enforceable right of recovery" (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017]). 
"[A] motion pursuant to CPLR 3211 (a) (1) must be granted where the documentary evidence 'conclusively refutes plaintiff's factual allegations' and establishes a defense as a matter of law" (Doller v Prescott, 167 AD3d 1298, 1299 [3d Dept 2018], quoting Kolchins v Evolution Mkts., Inc., 31 NY3d 100, 106 [2018]). 
A. The Contractual Claims
1. Merger Clause
Defendants first contend that plaintiffs' contractual claims, sounding in breach of warranty, are precluded by the APA's broad merger clause. Defendants emphasize that the APA makes no affirmative representations regarding the availability of the Cenex tanks and, in fact, does not even refer to the tanks (see NYSCEF Doc No. 37 ["MOL"] at 16-19). 
Section 8.06 of the APA, captioned "Entire Agreement," provides:
This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. No representation, warranty, condition, understanding or agreement of any kind shall be binding on the parties unless incorporated herein. . . .
"The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing" (Jarecki v Shung Moo Louie, 95 NY2d 665, 669 [2001] [citation omitted]). Thus, the merger clause precludes any allegation by Peckham that "[t]he availability of the Cenex tanks" was "material consideration" for execution of the APA (Complaint, ¶ 87).
But, as plaintiffs observe in opposition to the motion, their warranty claims are based on express written warranties in the APA, not extra-contractual representations precluded by the merger clause. Under Section 4.06 (a), defendants warranted that "there has not been any . . . event, occurrence or development that . . . could reasonably be expected to have . . . a Material Adverse Effect." And under Section 4.25, defendants warranted that "[t]here is no fact known to any Seller regarding any Seller or the Business . . . that materially adversely affects or threatens either of the Business, the Purchased Assets, or the prospects, financial condition, or results of operations of the Business that has not been set forth in this Agreement or a related Schedule."
A merger clause precludes reliance on extra-contractual representations (see Jarecki, 95 NY2d at 669), but it does not and cannot bar a claim based on express warranties embodied in the same agreement. "The express warranty is as much a part of the contract as any other term" (CBS Inc. v Ziff-Davis Publ. Co., 75 NY2d 496, 503 [1990]; see Merrill Lynch & Co. Inc. v Allegheny Energy, Inc., 500 F3d 171, 185 [2d Cir 2007]).
Accordingly, the merger clause of Section 8.06 does not bar plaintiffs' claims for breaches of Sections 4.06 (a) and 4.25.
2. Legal Sufficiency
Defendants next argue that the warranty claims are "based on the fatally flawed premise" that defendants were "contractually obligated to disclose facts about third parties," including (i) the post-closing "corporate opportunity" (Complaint, ¶ 107) presented by the Cenex tanks, and (ii) Bitumar's potential entry into the regional market (MOL at 19-20). "Peckham's contention that the Gorman Group was obligated to disclose a potential corporate opportunity and whether a competitor may enter the regional market would require this Court to impermissibly add express terms to the APA" (id. at 20).
In interpreting the APA, the Court is "guided by basic principles of contract interpretation which instruct that a contract should be construed to give effect to the parties' intent as gleaned from the four corners of the document itself, provided that its terms are clear and unambiguous" (Elmira Teachers' Assn. v Elmira City School Dist., 53 AD3d 757, 759 [3d Dept 2008], lv denied 11 NY3d 709 [2008]). "[A] contract should be interpreted according to its [*5]plain and ordinary meaning" and "in such a manner as to give effect to all of its provisions" (id.; see TAG 380, LLC v ComMet 380, Inc., 10 NY3d 507, 512-513 [2008]). In so doing, it is "important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases" (South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 277 [2005]).
a. Section 4.06
Defendants warranted in Section 4.06 (a) that "there has not been any . . . event, occurrence of development that . . . could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."[FN5]
The term "Material Adverse Effect" is defined in article I of the APA to mean "any event, occurrence, fact, condition or change that . . . could reasonably be expected to become . . . materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Sellers to consummate the transactions contemplated hereby on a timely basis."
Defendants argue that the language of Section 4.06 (a) "is limited to an event, occurrence or development related to the conduct of the 'Business' since December 31, 2022," and they maintain that imposing an obligation "to disclose a competitor's potential entry in the regional liquid asphalt market would fundamentally alter this disclosure obligation" (MOL at 21 [emphasis omitted]). Defendants further contend that "Section 4.06 contains an exhaustive and detailed list of twenty-one 'changes, events and conditions' that have not occurred since December 31, 2022. If the parties had intended to include the availability of 'corporate opportunities,' they could have easily done so . . ." (id.). 
The Court does not find defendants' construction of Section 4.06 (a) to be persuasive. Read together with article I, Section 4.06 (a) broadly encompasses any "event, occurrence or development" reasonably expected to cause a material adverse effect on "the business, results of operations, condition (financial or otherwise) or assets of the Business" or "the value of the Purchased Assets." By its express terms, this language goes beyond the internal operations and affairs of the Gorman Group and encompasses developments posing a material threat to the value of the purchased asphalt business. And plaintiffs' allegations regarding the unavailability of the Cenex tanks and the leasing of those tanks to a new and formidable competitor operating out of the Port of Rensselaer and staffed by defendants' former managers suffice to state a claim of breach under Section 4.06 (a).
b. Section 4.25
Defendants warranted in Section 4.25 that they were aware of "no fact" that "materially . . . threatens either of the Business, the Purchased Assets, or the prospects, financial condition, or results of operations of the Business that has not been set forth in this Agreement." According to defendants, Section 4.25 is confined to facts regarding the Business and Purchased Assets, and the "parties' definitions of 'Business' and Purchased Assets (which contains an exhaustive list of the purchased assets) do not include any 'corporate opportunities,'" or the Gorman Group's "competitive position in the regional market" (MOL at 20).
Again, defendants seek to add limitations to the scope of the warranty that are not present in the plain language of Section 4.25. Defendants broadly warranted that they were aware of "no [*6]fact" that materially "threaten[ed]" the "prospects" of the asphalt business that was not "set forth in [the APA]." For the reasons stated above, plaintiffs' allegations regarding the establishment of a competing asphalt business, staffed by defendants' former key personnel, using the adjacent storage tanks that Peckham had been led to believe were available for lease sufficiently allege a material threat within the scope of Section 4.25.
c. Conclusion
Taken together, Sections 4.06 and 4.25 reflect the parties' bargain that at the time of the APA closing, defendants were unaware of any undisclosed material threats to the business or assets purchased by Peckham, regardless of whether the threats involved matters internal to the Gorman Group or external threats posed by third parties. 
The Complaint adequately alleges that defendants breached these warranties by knowingly concealing Bitumar's lease of the Cenex tanks and its competitive entry into the Port of Rensselaer and the regional asphalt market, as well as the resulting threats to the value and prospects of the asphalt "Business" and related assets purchased by Peckham. 
Accordingly, the branch of the motion seeking dismissal of the warranty claims for pleading insufficiency is denied.[FN6]

B. Fraudulent Inducement
Unlike the breach of warranty claims, plaintiffs' claim of fraudulent inducement is predicated upon alleged extra-contractual assurances regarding the availability of the Cenex tanks and the "value add" posed by that "corporate opportunity" (Complaint, ¶¶ 166-167).
Initially, the Court agrees with defendants that the fraud claim is precluded by Section 8.06 and plaintiffs' agreement therein that the APA "supersede[s] all prior and contemporaneous understandings and agreements, both written and oral, with respect to [the transaction]" and that "[n]o representation, warranty, condition, understanding or agreement of any kind [concerning the transaction] shall be binding on the parties unless incorporated [in the APA]." 
Although the general rule is that a "merger clause will not preclude parol evidence regarding fraud in the inducement" absent a particularized disclaimer (Rosenblum v Glogoff, 96 AD3d 514, 514-515 [1st Dept 2012]; see Citibank v Plapinger, 66 NY2d 90, 94-95 [1985]), "that specificity requirement may be relaxed (or even altogether disregarded)" where, as here, "the clause and its surrounding contract were the product of arm's-length negotiations between sophisticated parties" (Petedge, Inc. v Garg, 234 F Supp 3d 477, 488 [SD NY 2017]; accord AT&T Corp. v Atos IT Solutions. & Servs., Inc., 714 F Supp 3d 310, 332 [SD NY 2024]; see Axginc Corp. v Plaza Automall, Ltd., 759 Fed Appx 26, 30 [2d Cir 2018]; see also Hewlett v Staff, 235 AD2d 696, 697 [3d Dept 1997]). Such an approach is warranted here, where the parties negotiated an intricate 61-page APA with hundreds of pages of detailed schedules and exhibits for a complex transaction involving tens of millions of dollars (see CDO Plus Master Fund Ltd. v Wachovia Bank, N.A., 2009 WL 2033048, *5, 2009 US Dist LEXIS 59540, *13 [SD [*7]NY, July 13, 2009, No. 07 Civ 11078 (LTS/AJP)]). 
In any event, the claim of fraudulent inducement fails because plaintiffs have not adequately alleged justifiable reliance on any alleged oral representations (see DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d 147, 153 [2010]). A party that has "the means of discovering, by the exercise of ordinary intelligence, the true nature of a transaction . . . must make use of those means or it cannot be heard to complain that it was induced to enter into the transaction by misrepresentations" (Woods v 126 Riverside Dr. Corp., 64 AD3d 422, 423 [1st Dept 2009], lv denied 14 NY3d 704 [2010]; see Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 17 NY3d 269, 278-279 [2011]). 
Here, plaintiffs are sophisticated commercial parties who were given months to conduct due diligence (see Complaint, ¶¶ 36, 89, 104). And plaintiffs were well-aware of Bitumar's desire to enter the Northeast U.S. asphalt market (see e.g. id., ¶ 92) and defendants' inability to "finalize[] the lease terms with Cenex" (id., ¶ 58). Moreover, Peckham was in direct communication with Cenex during the due-diligence period in connection with the assignment of certain contractual rights under the APA (see NYSCEF Doc Nos. 28-29; NYSCEF Doc No. 42 at 14), but Peckham does not allege that it made any pre-closing inquiry of Cenex concerning the availability of the tanks or the prospect of the tanks falling under the control of a potential competitor.[FN7]

Under the circumstances, plaintiffs' blind reliance on oral representations concerning the alleged "corporate opportunity"[FN8]
posed by the Cenex tanks and their role as a "value add" to the asset purchase transaction was unjustified as a matter of law (see Centro, 17 NY3d at 279; Arfa v Zamir, 76 AD3d 56, 59 [1st Dept 2010], affd 17 NY3d 737 [2011]; Lusins v Cohen, 49 AD3d 1015, 1017 [3d Dept 2008]).[FN9]

CONCLUSION
Accordingly,[FN10]
it is
ORDERED that defendants' motion to dismiss is granted only to the extent of dismissing the fourth cause of action for fraudulent inducement, and the motion is otherwise denied; and it is further
ORDERED that defendants shall answer plaintiffs' complaint, as limited herein, within twenty (20) days from the date of this disposition; and finally it is
ORDERED that a remote preliminary conference hereby is scheduled for November 10, 2025 at 10:30 a.m., and the parties shall confer in advance of such conference regarding (i) their willingness to proceed to mediation or other form of alternative dispute resolution, and (ii) a schedule for the expedited completion of all necessary disclosure.
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for plaintiffs shall promptly serve notice of entry on all parties entitled thereto.
Dated: October 2, 2025
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1, 11-34, 37, 42, 45.

Footnotes

Footnote 1:The facts are drawn from plaintiffs' complaint and assumed to be true for purposes of this motion.

Footnote 2:"All States acquired assets relating to Defendants' emulsions business and its highway construction & maintenance business" (Complaint, ¶ 44; see also NYSCEF Doc No. 33).

Footnote 3:Plaintiffs' third cause of action, which is not an issue herein, concerns environmental liabilities (see id., ¶¶ 155-164).

Footnote 4:All States is prosecuting a nearly identical lawsuit in the U.S. District Court for the Northern District of New York, where a similar motion to dismiss is pending (see NYSCEF Doc No. 37 at 2 n 3, citing All States Construction, Inc., et al. v Gorman et al., No.: 25-cv-156 [LEK/TWD]). All States and Peckham also have sued House, Scarcella and Wilson "for purported trade secret misappropriation" (id. at 6 n 24, citing All States Construction, Inc., et al. v House, Case No.: 1:24-CV-1133 [GTS/DJS]).

Footnote 5:Defendants further warranted that the Business "has been conducted in the ordinary course . . . consistent with past practice" (APA, § 4.06), a representation that is not at issue herein.

Footnote 6:The Court notes "the general rule . . . that a buyer may enforce an express warranty even if it had reason to know that the warranted facts were untrue" (Merrill Lynch, 500 F3d at 186). After all, warranty is "an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself" (Metropolitan Coal Co. v Howard, 155 F2d 780, 784 [2d Cir 1946]; accord CBS, 75 NY2d at 503).

Footnote 7:There is no merit to Peckham's contention that the confidentiality agreement with the Gorman Group precluded such an inquiry (see NYSCEF Doc No. 42 at 13). Nothing in that agreement prohibited Peckham from discussing the availability of the Cenex tanks with Cenex (see LOI, ¶¶ 10-11 [relating only to the "contents" of the LOI]).

Footnote 8:Plaintiffs describe the Cenex tanks as a "corporate opportunity," but there is no allegation that the Gorman Group had a tangible interest or expectancy in obtaining a lease (see Alexander & Alexander of NY v Fritzen, 147 AD2d 241, 246-247 [1st Dept 1989]), just a history of failed negotiations directed at a lease.

Footnote 9:The "special facts" doctrine similarly requires plaintiffs to establish that the information was "peculiarly within [the] knowledge of [defendants], and . . . was not such that could have been discovered by [plaintiffs] through the exercise of ordinary intelligence" (Jana L. v West 129th St. Realty Corp., 22 AD3d 274, 278 [1st Dept 2005] [internal quotation marks and citations omitted] [emphasis added]).

Footnote 10:To the extent not expressly addressed, the parties' remaining arguments have been considered and found to be either without merit and/or unnecessary to entertain given the disposition reached herein.