| **Fraga v Best & Co. NYC** |
|:---:|
| 2024 NY Slip Op 33851(U) |
| October 27, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 653188/2019 |
| Judge: Andrea Masley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:    HON. ANDREA MASLEY             PART      48

*Justice*

-------------------------------------------------------------------------------X

ARMINIO FRAGA and LUCYNA FRAGA,            INDEX NO.      653188/2019

            Plaintiffs,

- v -

BEST & COMPANY NYC, DESIGN DEVELOPMENT NYC,
INC., RICHARD FERRAIOLI, and EARL BRIAN,

            Defendants.

-------------------------------------------------------------------------------X

This is an action by customers dissatisfied with the contractor hired to renovate their New York City residence on Fifth Avenue (Project). (NYSCEF 300, Second Amended Complaint.) On May 30, 2019, plaintiffs Armino and Lucyna Fraga commenced this action by summons and complaint. (NYSCEF 1, Summons and Complaint.) The complaint has since been amended twice, with plaintiffs alleging in the operative complaint: (1) breach of contract, (3) negligence against all defendants, and (5) fraud against all defendants.[1] (NYSCEF 300, Second Amended Complaint [SAC] ¶¶ 5-12; NYSCEF 296, March 22, 2022 Decision.) Plaintiffs seek damages in the amount

---

[1] Plaintiffs withdrew their second cause of action for a Lien Law Article 3-A Trust Fund violation and fourth cause of action for willful exaggeration in the First Amended Complaint against Richard Ferraioli. (NYSCEF 316, May 26, 2022 decision.) The court granted plaintiffs' motion to amend to add a claim for fraud but denied as to a claim for conversion. (NYSCEF 296, March 22, 2022 Decision.) Thus, the SAC contained claims for breach of contract, Lien Law Article 3-A Trust Fund violation, negligence, willful exaggeration of Mechanic's Lien, and fraud. (NYSCEF 300, Second Amended Complaint.) At trial, plaintiffs withdrew the second and fourth causes of action because DDNYC and the subcontractors withdrew their liens. (NYSCEF 577, Plaintiffs' post-trial memo at 2, n 1.)

# OTHER ORDER – NON-MOTION

of $1,876,726.52 with interest from March 2019. (NYSCEF 450, Timothy tr aff ¶ 16; NYSCEF 404, Highline's Continuation Sheet.)

Defendants Best & Company NYC (BEST), Design Development NYC, Inc. (DDNYC), Richard Ferraioli,[2] and Earl W. Brian, III assert counterclaims for unjust enrichment and attorneys' fees. (NYSCEF 7, Answer and Counterclaims.) Defendants seek $295,758.75 in damages. (NYSCEF 582, Defendants' Findings of Fact.)[3]

## Contentions

Plaintiffs contend that defendants' work was subpar, incomplete, and, in the end, destructive and, thus, plaintiffs overpaid DDNYC by over 50%. (NYSCEF 452, Joint Undisputed Facts ¶10; NYSCEF 447, Bavolek tr aff ¶ 37.) On November 30, 2018, defendants issued a notice of substantial completion, which was premature according to plaintiffs. (NYSCEF 358, Defendants' Notice of Substantial Completion; NYSCEF 578, Plaintiffs' Findings of Fact ¶ 33.) On January 16, 2019, the architect issued a punch list of 147 items giving one week (January 23, 2019) to complete it, which was extended to March 8, 2019. (NYSCEF 359, punch list; NYSCEF 456, Smith tr aff ¶ 17; NYSCEF 360, January 16, 2019 email chain among Bavolek, Blaney, Smith and Ferraioli.) Plaintiffs contend that instead of completing the punch list, defendants brought in unskilled laborers who destroyed the apartment, degraded its high-end finishes, and

---

[2] Ferraioli's motion for summary judgment (motion sequence 005) was denied and Ferraioli was directed to submit the transcript to be so ordered, but he failed to do so. (NYSCEF 316, May 26, 2022 Decision.)

[3] The counterclaims list damages at $216,525.02. Brian states the outstanding balance is $216,525.02. (NYSCEF 444, Brian tr aff ¶ 27.) In addition, DDNYC's mechanic's lien was for $216,525.02. (NYSCEF 440, Mechanic's Lien.)

[* 2]

caused damage.  (NYSCEF 453, Blaney tr aff ¶ 14; NYSCEF 447, Bavolek tr aff ¶¶ 29, 36.)

Plaintiffs assert the following bad acts by defendants:

• Defendants proffered "worthless worker's compensation insurance policy naming, as insured, a corporation with no employees."  (NYSCEF 577, Plaintiffs' post-trial memo 41/53; [4] NYSCEF 352, Contract at 53, 79 [certificate of workers compensation insurance].)

• Defendants used MDF when the plans called for wood.  (NYSCEF 577, Plaintiffs' post-trial memo 41/53; NYSCEF 352, Contract, generally; NYSCEF 453, Blaney tr aff ¶ 29; NYSCEF 385, photos at 55, 57-61, 63, 64, 66, 68-71.)

• Defendants concealed a toilet vent pipe behind a closed wall without proper ventilation.  NYSCEF 577, Plaintiffs' post-trial memo 41/53; NYSCEF 532, photo of pipe; NYSCEF 385, photos at 59.)

• Defendants unreasonably delayed payment of subcontractors despite being timely paid by plaintiffs.  (NYSCEF 577, Plaintiffs' post-trial memo 41/53; NYSCEF 463, October 17, 2018 emails at 75, 85-86, 97, 122; NYSCEF 366, March 6, 2019 emails.)

• Defendants were paid the full price for windows, but plaintiffs had already partially paid for the windows to the vendor directly, but defendants failed to issue a credit.  (NYSCEF 577, Plaintiffs' post-trial memo 41/53; NYSCEF 530, April 9, 2018 emails regarding Revival Sash Windows.)

• Defendants charged plaintiffs for materials, which were never delivered, or charged for services, that were never provided, all listed in the contract for which plaintiffs paid, and defendants failed to issue a credit.  (NYSCEF 577, Plaintiffs' post-trial memo 41/53; NYSCEF 382, Blaney's list of contract line materials and services.)

• Defendants hired incompetent and unskilled labor to complete the punch list. (NYSCEF 577, Plaintiffs' post-trial memo 41/53; NYSCEF 463, October 17, 2018 emails at 116-120; NYSCEF 385, photos at 3, 5, 26-28, 30, 32, 44, 45, 46, 24, 29, 59, 64, 77, 78; NYSCEF 572, Blaney tr at 123:11-124:21.)

In the SAC, plaintiffs allege that the individual defendants are liable for breach of contract because BEST "is not a legal entity."  (NYSCEF 300, Second Amended Complaint at ¶33.)  Plaintiffs mention an alternative claim of breach of contract against

---

[4] NYSCEF pagination.

DDNYC if the court finds that plaintiffs did not have a contract with Ferraioli and Brian. (*Id*. 34.) At trial, plaintiffs' legal theory evolved to piercing the corporate veil to hold Ferraioli and Brian personally liable for DDNYC's breach of contract because of the individual defendants' bad acts. (NYSCEF 578, Plaintiffs' Findings of Fact ¶¶57-84. See generally NYSCEF 446, Blass tr aff; NYSCEF 461, Blass Report.) Plaintiffs also contend that these acts constitute negligence and fraud by all defendants for which the individual defendants would be liable. (*Id.* ¶¶ 50-77.) Plaintiffs assert fraud, alleging that Ferraioli and Brian diverted corporate funds for personal use. (NYSCEF 300, SAC ¶¶58-77.) Plaintiffs' fraud claim relies on defendants' failure to provide records or documents to corroborate defendants' claim that these were legitimate corporate expenses. (*Id.* ¶ 72.) Plaintiffs offer Blass's testimony to establish that defendants failed to observe corporate formalities, took corporate funds for private use, and that Brian used Project funds to support his other businesses, Bespoke, OPUS, and Mill House Coffee House, Inc., a coffee shop located in the same building as OPUS, Bespoke, and DDNYC. (*See generally* NYSCEF 446, Blass aff.) Plaintiffs seek $1,876,726.52 in damages jointly and severally. (NYSCEF 450, Timothy tr aff ¶16; NYSCEF 404, Highline's Continuation Sheet.)

Defendants counter that they owe plaintiffs nothing because they did their contractual work without complaint but were unable to complete the Project because of the design team's lack of cooperation. (NYSCEF 444, Brian tr aff ¶¶ 23-24.) Defendants insist that all material and services for which plaintiffs paid were provided. (*Id.* ¶ 18.) Rather, plaintiffs owe defendants the balance on the contract in the amount of $295,758.75 including: $109,185.29 due to unpaid subcontractors, $79,233.73

[* 4]

balance due to DDNYC on the contract, and $107,339.73 for work performed between January 1, 2019 and February 28, 2019, but not invoiced. (NYSCEF 353, Defendants' Application for Payment at 41 and 43; NYSCEF 582, Defendants' Findings of Fact ¶ 28.) Moreover, plaintiffs breached the contract by not paying defendants the contractual amount and by failing to give defendants an opportunity to cure. (NYSCEF 352, Contract §10.) Accordingly, defendants seek attorneys' fees under the contract. (*Id.* §8.12.)

Defendants contend that their work was professional and consistent with the contract. Indeed, defendants counter that, prior to termination, defendants never received notice of code violations. (NYSCEF 444, Brian tr aff ¶ 23.) Indeed, AK Engineering was hired to ensure compliance with DOB Code requirements, but never informed defendants of such a violation. (*Id.*) Further, nine of defendants' ten invoices were paid in full without objection. (NYSCEF 572, Fraga tr at 48:12-22.) Until November 2018, plaintiffs never complained about defendants' work or challenged their invoices by, for example, demanding an accounting or copies of back-up subcontractor invoices. (NYSCEF 573, Bavolek tr at 41:8-10.) Indeed, plaintiffs praised defendants' work in an email to Bavolek. (NYSCEF 438, November 21, 2022 email.)

As to plaintiffs' claim that defendants improperly failed to pay three subcontractors, defendants explain that plaintiffs rejected the work of those subcontractors because plaintiffs asserted the subcontractors' work was defective. (NYSCEF 572, Fraga tr at 48:12-15; NYSCEF 576, Ferraioli tr at 3:21-25; 4:1-13.) Further, Ferraioli testified that plaintiffs prevented defendants from curing these deficiencies as required by the contract. (NYSCEF 445, Ferraioli tr aff ¶¶ 12-13.)

[* 5]

Defendants admitted that they were unable to complete the punch list but assert interference by plaintiffs' design team which refused to cooperate with defendants such as answering questions. (NYSCEF 445, Ferraioli tr aff ¶ 13; NYSCEF 436, DDNYC's November 21, 2018 Completion List.)

As to the adverse inference, defendants challenge the March 22, 2022 Order as inconsistent with the court's ruling on the record which preceded the March 22, 2022 order. (Compare NYSCEF 296, March 22, 2022 Order to NYSCEF 313, March 16, 2022 tr at 18:2-24:22.) Rather, defendants' request that the court apply an adverse inference based on the impact, if any, of the absence of defendants' Procore work records between June 2018 and March 2019. (NYSCEF 313, March 16, 2022 tr at 19:13-14; 19:15-20:15.)

Defendants object to plaintiffs' reliance on a U.S. Department of Labor case against DDNYC as proof of undercapitalization because the DOL case was settled "long before" the parties met. (NYSCEF 412, US Dept. of Labor News Release, reporting on March 17, 2017 settlement of $726,989 for back wages and liquidated damages arising from misclassifying 184 employees as independent contractors instead of employees and overtime and recordkeeping violations.)

Defendants also object to the testimony of Anthony McCarthy, another DDNYC client who was unhappy with DDNYC's work and initiated litigation against DDNYC, as completely unrelated to this action. (NYSCEF 422-423, 499-524, Riverside litigation documents.) Plaintiffs called McCarthy in support of their fraud claim. Likewise, defendants object to the relevance of other litigation against DDNYC. (NYSCEF 424,

[* 6]

457-458, Schmidt litigation; NYSCEF 534, Stipulation of discontinuance in 2019 action *State Ins. Fund v DDNYC.)*

In sum, defendants challenge plaintiffs' contentions as undermined by the facts. First, plaintiffs paid defendants $3.4 million without objection. (NYSCEF 444, Brian tr aff ¶¶ 14, 16.) Second, plaintiffs took occupancy of the apartment. (NYSCEF 576, Ferraioli tr at 115:25-116:1.) Defendants challenge plaintiffs' demand for $1.8 million in damages since the cost to repair the alleged defects was significantly less. Finally, defendants challenge plaintiffs' other witnesses as bias and unreliable.

**The Contract**

The contract is executed by the Fragas and Brian, as CEO of BEST & Co. NYC. The relevant portions of the contract are as follows:

ARTICLE 8 CONTRACTOR

§8.12 INDEMNIFICATION "To the fullest extent permitted by law the Contractor shall indemnify and hold harmless the Owner, and Architect and agents and employees or any of them from and against claims, damages losses and expenses, including but not limited to reasonable attorneys' fees and expenses, arising out of or issuing from the negligent acts or omissions of the Contactor, a Subcontractor, anyone directly or indirectly employed by them relating to the Work or anyone for whose acts they may be liable, provided, however, if such claim, damage, loss or expense is caused in part by a party indemnified hereunder or any third party. Contractor shall only be liable for Contractor's portion of the liability." (NYSCEF 352, Contract.*)*

ARTICLE 10 CHANGES IN WORK

§10.1 "The Owner, without invalidating the Contract, may order changes in the work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly in writing (a "Change Order"). If the Owner and Contractor cannot agree to a change in the Contract Sum, the Owner shall pay the Contractor the following sum: (x) its actual costs incurred; plus (y) (i) fifteen (15%) for overhead and profit; (ii) thirteen percent (13%) for general conditions; and (iii) four percent (4%) for insurance." (*Id.*)

ARTICLE 12 PAYMENTS AND COMPLETION

§12.5 SUBSTANTIAL COMPLETION

"§12.5.1 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents and the Schedule In order to utilize the Work for its intended use, as reasonably determined by the Architect. The date of Substantial Completion is set forth on the Schedule." (*Id.* at 10)

"§12.5.2 When the Work or designated portion thereof is substantially complete, the Architect will make an inspection to determine whether the Work is substantially complete. When the Architect determines that the Work is substantially complete, the Architect will prepare a Certificate of Substantial Completion that shall establish the date of Substantial Completion, shall establish the responsibilities of the Owner and Contractor, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion." (*Id.*)

ARTICLE 14 CORRECTION OF WORK

"§ 14.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION The Contractor shall promptly correct Work rejected by the Architect as failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work shall be at the Contractor's expense." (*Id.*)

"§ 14.2 AFTER FINAL COMPLETION In addition to the Contractor's other obligations, including, the warranty set forth on Section 8.5, if, within six months year after the date of Final Completion of the Work, if any of the Work is determined in good faith by the Architect to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Architect or Owner has previously given the Contractor and Architect a written acceptance specifically of such condition. The Owner shall give such notice to the Architect and Contractor promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty." (*Id.*)

"§ 14.3 If the Contractor fails to correct nonconforming Work within a reasonable time, the Owner may correct it in accordance with the terms of the Contract

Documents and the Contractor shall reimburse Owner for such reasonable costs." (*Id.*)

ARTICLE 16 TERMINATION OF THE CONTRACT

"§16.2.3 When the Owner terminates the Contract for one of the reasons stated in Section 16.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished." (*Id.* at 11.)

## The Trial

Plaintiff offered the following witnesses at trial: Lucyna Fraga, owner;[5] Amanda Blaney, plaintiffs' interior designer;[6] Nathan Bavolek, the owners' representative;[7] Chad Smith, the Project architect;[8] Anthony McCarthy, a former customer of defendants;[9] and Breadon Timothy of Highline Construction, which completed the Project.[10] Timothy also testified as an expert on construction estimates. Alan Blass, CPA, testified as plaintiffs' expert on fraud. Plaintiffs also submitted the deposition transcript of Richard Ferraioli by reading it into the record.[11] (See PJI 1:94; NYSCEF 572, May 7, 2021; NYSCEF 573, June 17, 2021.)

Defendants offered the testimony of Richard Ferraioli[12] and Earl Bryan.[13] Defendants also called Rebecca Fitzhugh, CPA,[14] to rebut Blass. (NYSCEF 575, Fitzhugh tr at 96:12-15.)

---

[5] NYSCEF 572, tr.
[6] NYSCEF 572 and 573 tr.
[7] NYSCEF 573 tr.
[8] Smith's trial affidavit is in evidence in its entirety since there was no cross examination.
[9] NYSCEF 575 tr.
[10] NYSCEF 574 tr.
[11] The court agreed to submission of the deposition transcripts of Brian and Ferraioli. (NYSCEF 574, tr 3:13-4:14.)
[12] NYSCEF 575 tr.
[13] NSYCEF 576 tr.
[14] NYSCEF 575 tr.

[* 9]

Ferraioli, DDNYC's project manager on the Project, was employed by DDNYC with a title of president from June 2017 to October 2019; he had no ownership interest in DDNYC. (NYSCEF 445, Ferraioli tr aff ¶¶ 2-3 e; NYSCEF 407, Schedule U at 76.) However, he had the traditional symbols and responsibilities of a corporate officer. (NYSCEF 445, Ferraioli tr aff ¶5 ["I was an authorized signatory on DDNYC's operating and payroll checking accounts to sign checks"]; NYSCEF 407, Blass Schedules at 72-75 [FERRAIOLI's salary was $3,365.38-$4,807.70 during the relevant period].) The court denied Ferraioli's motion for summary judgment dismissing the contract claim as against him where his sole argument was that he had not signed the contract. However, plaintiffs' theory was not based on his signature, but on plaintiffs' claim that BEST was an empty shell and the corporate officers are liable for the corporation's bad acts.[15]

> "As a matter of public policy, an officer or director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken * * * To hold otherwise would be dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations." (*Joan Hansen & Co., Inc. v Everlast World's Boxing Headquarters Corp.*, 296 AD2d 103, 109 [1st Dept 2002] [citations omitted].)

However, an officer may be personally liable for a breach of contract if "the acts complained of, whether or not beyond the scope of the defendant's corporate authority, were performed with malice and were calculated to impair the plaintiff's business for the

---

[15] While Ferraioli objected to this theory on reply, he failed to mention the certificate of assumed name. (NYSCEF 289.) Had defendants done so the breach of contract claim would have been dismissed in its entirety. Nevertheless, plaintiffs' contract theory evolved.

[* 10]

personal profit of the defendant." (*Id.* at 110.)  Plaintiff has so alleged here and, thus, Ferriaoli's motion was legally deficient.  Ferraioli visited the site weekly.  (*Id.* ¶ 8.)  At trial, Ferraioli admitted when he did not know the answer to a question.  The court found Ferraioli credible and unflappable despite counsel's huffing and puffing and incredulity during cross examination.

Brian is the CEO of DDNYC of which he owns 55%.  (NYSCEF 444, Brian tr aff ¶ 2.)  Brian signed the contract, on behalf of BEST, but did not visit the site, rather relying on updates from Ferraioli, Bavolek, Smith, and Blaney.  (*Id.* ¶ 10; NYSCEF 352, Contract.)  Brian is a partial owner of Bespoke, a millwork fabrication company; it provided millwork to the Project.  (NYSCEF 565, May 6, 2021 Brian Deposition tr at 48:3-13, 88:8-10, 6:20-78:10, 127:1-10.)  Brian also owns 55% of Opus AD LLC, an architectural design firm, though he is not an architect, which provided services to the Project.  (NYSCEF 565, Brian depo tr at 49:21-51:21.)  Brian is also the co-owner of the Millhouse Coffee House.  (NYSCEF 56, Brian tr at 96:17-97:2.)  The court credits Brian's testimony, but it was of little value since he was not on site.

Lucyna Fraga testified, but her testimony was of limited value since she was not on site.  (NYSCEF 355, July 26, 2018 email to BEST.)  Rather, Lucyna Fraga's most significant contribution to this matter is her email of November 21, 2022, immediately before DDNYC issued its substantial completion notice, in which she wrote "What dense year it has been.  Crazy at times, but we are very close to a wonderful result,... Let's keep final push going strong radiators covers, closet doors and many painters so all looks finished" which contradicts plaintiffs' position in this action.  (NYSCEF 438, November 21, 2022 email; NYSCEF 572, Fraga tr at 65:23-25; 66:1-5.)  At trial, Lucyna

Fraga characterized this email as optimistic but the email did not express optimism. (NYSCEF 572, Fraga tr at 65:23-25; 66:1-5.) The court finds it expressed the state of the renovation and her satisfaction with its progress to that date.

Blaney testified that she could not comment on how Bavolek did his job. (NYSCEF 572, Blaney tr at 104:23-105:9.) However, whether Bavolek was doing his job is critical to this decision. He approved payments of defendants, 50% of which plaintiffs now seek to reclaim or claw back.[16] Blaney was at the site one to two times per week. (*Id.* at 102:8-12.) Accordingly, Blaney's testimony is of limited value.

The court also discounts Blaney's testimony because it is contradicted by the record. For example, Blaney determined that the walls were not plumb. (*Id.* at 113:9-115:7.) However, it is unclear why this observation was not made as soon as the walls were erected and not until after plaintiffs paid defendants for the work of installing the walls. Moreover, the walls were simply skim coated to resolve the problem, not demolished which undermines Blaney's statement and outrage. (NYSCEF 574, Timothy tr at 23:18-24:18; NYSCEF 574, Blaney tr at 23:18-25; 24:1-2, 7-14; NYSCEF 453, Blaney tr aff ¶ 38.) In addition, Blaney testified that defendants' overcharge for the windows amounted to $92,840, which she said was a majority of the $259,237.78

---

[16] Clawing back employee wages is limited to instances of employee "embezzlement, improperly competing with the current employer, or usurping business opportunities." (*Veritas Capital Mgt., L.L.C. v Campbell,* 82 AD3d 529, 530 [1st Dept 2011], *lv dismissed* 17 NY3d 778 [2011].) "[A]n employee or agent who is faithless in the performance of his or her duties is not entitled to recover either salary or commission." (*Two Rivs. Entities, LLC v Sandoval,* 192 AD3d 528, 529 [1st Dept 2021].) However, defendants are not plaintiffs' employees and plaintiffs have not asserted a claim for faithless servant.

[* 12]

damage assessment she prepared.  However, that amount is not incorporated in the $259,237.78 total.  (NYSCEF 384, Blaney List at 5, §8-600.)  Therefore, the court finds that Blaney exaggerates, and her testimony and calculations are unreliable.  (PJI 1:22, Falsus in Uno.)

Blaney's testimony is also contradicted by the fact that plaintiffs moved into the apartment on February 21, 2019 before Highline was hired.  (NYSCEF 573, Blaney tr at 83:10-12; 89:10-15; NYSCEF 576, Blaney tr at 115:25-116:1.)  Blaney testified that "the bathrooms were not functioning properly, the kitchen was not usable for cooking or serving meals, the gas service was not turned on, all of the rooms in the apartment remained unfinished." (NYSCEF 453, Blaney tr aff ¶ 18; NYSCEF 380, November 26, 2018 email Fraga to Bavelok.)

Timothy's testimony was helpful to the court but for one exaggeration.  Timothy testified to his observations on March 4, 2019 when he visited the project to consider replacing defendants.  (NYSCEF 450, Timothy tr aff ¶ 7.)  He testified to observing that floor supports were missing, and walls were closed without proper inspections.  (*Id.* ¶ 8.)  The court questions how Timothy observed such things during a walk though.  Accordingly, the court is skeptical of his bias.

Chad Smith, the project architect, testified that he was involved in the project the entire time.  (NYSCEF 448, Smith tr aff ¶ 4.)

On December 20, 2017, plaintiffs hired Opus.AD LLC (Opus), Brian's design firm, which employed Smith as an architect from time to time.  (NYSCEF 444, Brian tr aff ¶ 11.)  Bavolek approved all payment requests made initially by Opus which were later made by Smith & Architects.  (NYSCEF 572, Fraga tr at 48:12-20.)  The invoices clearly

state that Opus was billing for Brian's time as a design professional and plaintiffs failed to object. (NYSCEF 374, Brian's billing; NYSCEF 375, Smith & Architect Invoices.)

On March 2, 2018, plaintiffs hired Design Development NYC, Inc. d/b/a Best & Company NYC to renovate their apartment subject to an AIA contract (Contract) for the stipulated amount of $2,739,676. (NYSCEF 352, Contract at 4.) The project was to begin May 1, 2018 and be completed by September 15, 2018. (NYSCEF 352, Contract at 4.) "The completion date was important because the co-op board required that all major or noise making construction be completed by then." (NYSCEF 456, Smith tr aff ¶14.) The contract price included 15% for overhead and profit in the amount of $343,606 and 4% for insurance in the amount of $105,372. (NYSCEF 352, Contract at 55.) The parties agree that this was not a cost-plus markup contract. (*Id.* at 4; NYSCEF 573, Bavolek tr at 41:13-23.) DDNYC's budget is part of the Contract and provides the values for each trade, materials, and the fees for general conditions, overhead, profit and insurance. (NYSCEF 352, Contract at 54-78/79.) Accordingly, DDNYC's proposal, detailing all the charges to be expected by plaintiffs and accepted by plaintiffs, was incorporated in the Contract. The Contract set forth the procedures for payment pursuant to which DDNYC submitted payment requisitions for work performed and plaintiffs paid the invoiced amount. (*See generally* NYSCEF 352, Contract; NYSCEF 447, Bovalek tr aff ¶ 27.)

The Department of Buildings (DOB) work permit was issued on April 30, 2018, and the Project's work began in May 2018. (NYSCEF 445, Ferraioli tr aff ¶¶ 9-10; NYSCEF 290, DOB Permit.) DDNYC hired 14 subcontractors to complete the Project,

all of which were paid except three to which plaintiffs objected. (NYSCEF 445, Ferraioli tr aff ¶ 11.)

Plaintiffs' changes to the plans resulted in thirty-nine change orders representing a net increase of $850,015.11 in the contract price; the revised contract price was $3,589,691.11. (NYSCEF 444, Brian tr aff ¶ 15; NYSCEF 353, Application for Payment at 41/43.) The change orders included charges for overhead, profit, and insurance, as provided for in the Contract. (NYSCEF 352, Contract § 10.1.) Bavolek and plaintiffs approved all change orders submitted and plaintiffs paid for the changes. (NYSCEF 573, Bavelok tr at 34:10-12; NYSCEF 447, Bavolek tr aff ¶ 27.)

On July 26, 2018, Bavolek expressed to defendants Fraga's concerns regarding the slow pace: "[s]he views the cameras on site regularly and was disappointed regarding productivity this past month as daily workman counts in July were low many days." (NYSCEF 355, July 26, 2018 Email to BEST; *see also* NYSCEF 356, July 31, 2018 Email to BEST; NYSCEF 449, Fraga tr aff ¶ 20 ["From my review of the Nest cameras in the summer of 2018, I observed that from July to September BEST greatly decreased manpower on this project and they were failing to complete this work or to do same with alacrity. I expressed my concern regarding these issues with Nathan Bavolek."].)

In November 2018, two months after the contract's completion date, Bavolek expressed concern that the work was not nearing completion and that the co-op board would issue a stop work order. (NYSCEF 456, Smith tr aff ¶ 15.) Bavolek and Smith advised DDNYC of their concerns. (*Id.* ¶ 16.) Bavolek testified that "[t]he timeframe provided to the Fragas by their co-op board (to stop work after September 15, 2018)

[* 15]

had long since passed and the managing agent was pressuring the Fragas to curtail all noise-causing construction work. To this end, I requested that Best provide us with a notice of substantial completion so that I could convince the building's management that we were nearly finished with the project and to calm the managing agent's continued concerns." (NYSCEF 447, Bavolek tr aff ¶ 31.) On November 21, 2018, DDNYC submitted a list of items to be completed requesting information necessary to complete the Project, but plaintiffs' design team never responded to it. (NYSCEF 436, DDNYC Completion List.)

DDNYC issued its notice of substantial completion on November 30, 2018. (NYSCEF 358, Defendants' Notice of Substantial Completion.)

On December 28, 2018, DDNYC submitted its tenth payment requisition which reflected the total contract amount plus change orders which plaintiffs never paid. (NYSCEF 353, Applications for Payment at 41-43/43.)

Bavolek did not approve the tenth payment requisition because there were alleged issues raised with the quality of the work of defendants and their subcontractors. (NYSCEF 573, Bavelok trial tr at 34:23-25; 35:1.) According to Ferraioli, plaintiffs prevented the subcontractors and DDNYC from correcting the deficiencies of Stonecomb Inc. and CB Painting Inc. (NYSCEF 445 Ferraioli tr aff ¶¶ 12-13.) Ferraioli testified that it was not until March 8, 2019 that DDNYC was informed that a painter had mistakenly painted door hardware. (*Id.* ¶ 15.) However, the hardware issue was not listed on the punch list. (*Id.*)

Defendants rely on the payment requisition to show that defendants were owed $109,185.29 for work performed to December 31, 2018, which covered the amounts

[* 16]

allegedly owed to Stonecomb, CB Painting, and Dennis Cruz.  (NYSCEF 353, March 2, 2018 Application for Payment at 41-43/43.)  There was also a balance remaining on the contract in the amount of $79,233.73.  (*Id.* at 41.)  Thus, the payment application shows that plaintiffs owed defendants $188,419.02 when plaintiffs withheld approval of payment application number 10.  (*Id.* at 41-43/43.)

Pursuant to Article 12.5, architect Smith was required to prepare and transmit to DDNYC a "punch list" of items that were yet incomplete or that needed to be revised, redone or replaced.  (NYSCEF 352, Contract § 12.5.)  That "punch list," dated January 16, 2019, over 30 days after DDNYC's substantial completion notice, contained 147 items and called for a completion date of January 23, 2019.  (NYSCEF 359, Punch List.)  However, in an earlier draft of the punch list, Architect Smith acknowledged that DDNYC completed some items on the punch list that were listed as incomplete on the January 19, 2019 punch list.  (NYSCEF 445 Ferraioli tr aff ¶ 18; NYSCEF 437, Smith's December 13, 2018 list of outstanding items signed by Bavelok; see e.g. #3 at 3/75.)

After DDNYC left the project in March 2019, Bavolek noticed loose flooring that had not been installed properly.  (NYSCEF 573, Bevelok trial tr at 50:1-21.)  The floor was installed in June 2018, but Bavolek did not inspect the subflooring before the floor was installed.  (*Id.* 50:1-21, 55:14-18.)

On April 4, 2019, defendants were terminated again by letter from plaintiffs' counsel which included the January 16, 2019 punch list, a new list of alleged defective work, and a list of materials allegedly not delivered to the Project.  (NYSCEF 387, Termination Letter.)  Blaney created the list of undelivered materials in March 2019. (NYSCEF 367, Initial list; NYSCEF 453, Blaney tr aff ¶30.)

[* 17]

Plaintiffs hired Highline on May 22, 2019 to correct defendants' deficiencies and complete the Project which achieved substantial completion in September 2019. (NYSCEF 450, Timothy tr aff ¶ 10; NYSCEF 386, Highline Contract; NYSCEF 453, Blaney tr aff ¶ 35.) Timothy testified that plaintiffs continued to make changes in the scope of work after Highline was hired. (NYSCEF 574, Timothy trial tr at 13:2-13.) Highline submitted six invoices for a total of $2,282,875 which plaintiffs paid in full. (NYSCEF 450, Timothy tr aff ¶ 13; NYSCEF 400, Highline Payment Applications.) Of the total paid to Highline, Timothy calculated that $1,876,726.52 was due to defendants' deficiencies. (NYSCEF 450, Timothy tr aff ¶ 15.)

DDNYC ceased operations on September 20, 2019, when a court in an unrelated[17] matter froze DDNYC's operating account. (NYSCEF 444, Brian tr aff ¶ 29; NYSCEF 576, Brian tr at 105:13-14; NYSCEF 441, Temporary Restraining Order.)

**Findings of Law**

In 2016, DDNYC filed for an assumed name certificate for Best & Company NYC. (NYSCEF 289, March 15, 2016 Assumed Name Certificate; NYSCEF 444, Brian tr aff ¶ 2.) Therefore, the court rejects plaintiffs' legal theory that the individual defendants are responsible for plaintiffs' contract arguing that BEST was a sham corporation. The issue at trial was, thus, whether DDNYC breached the contract, and if so, whether the corporate veil could be pierced to get damages from the individual defendants.

The breach of contract claim against the individual defendants, who plaintiffs seek to hold liable for DDNYC's breach of contract, must be dismissed as a matter of law. The elements of a cause of action for breach of contract are "the existence of a

---

[17] Plaintiffs' witness McCarthy is the principal of the plaintiff in that matter.

contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." (*Harris v Seward Park Hous. Corp.*, 79 AD3d 425, 426 [1st Dept 2010] [citation omitted].) As discussed below, plaintiffs fail to satisfy the elements for breach of contract.

To hold the individual defendants liable, plaintiffs must establish a breach by DDNYC and facts necessary to pierce DDNYC's corporate veil. "[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." (*Matter of Morris v New York State Dept. of Taxation and Fin.*, 82 NY2d 135, 141 [1993].) Piercing is not an independent claim; as an initial matter, it requires a successful claim for breach of contract. (*Id.* ["an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners"].) Without a breach of contract by DDNYC, the court does not reach piercing.

Plaintiffs' claims against all defendants for negligence and fraud are dismissed to the extent that they are duplicative of the contract claim. "[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." (*Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 NY2d 382, 389 [1987] [citation omitted].) "[W]here, . . . , the gravamen of the complaint is breach of contract for substandard or incomplete work, the allegations merely sounded in breach of contract." (*Wiernik*, 59 AD3d at 537 [citation omitted].) Overbilling or double-billing for

labor and materials, using inferior materials, or failing to pay subcontractors relates to a breach of contract, not fraud. (*Delta Dallas Omega Corp. v Wair Assoc.*, 189 AD2d 701, 702 [1st Dept 1993].)

Here, plaintiffs' objections are classic breaches of contract: (1) defendants used MDF when the plans called for wood; (2) defendants concealed a toilet vent pipe by closing the wall without proper ventilation and before inspection; (3) defendants delayed payment of subcontractors despite being timely paid by plaintiffs; (4) defendants billed and collected from plaintiffs for material previously paid for by plaintiffs without issuing any credit, (i.e., windows); (5) defendants failed to deliver materials or perform services set forth in the contract, but for which plaintiffs in full; and (6) defendants hired incompetent and unskilled labor to complete the punch list. (NYSCEF 577, Plaintiffs' post-trial memo at 36.) Likewise, the court rejects plaintiffs' assertion of fraud based on inflated charges. (*Wiernik*, 59 AD3d at 537 ["[T]o the extent that the plaintiffs allege that the appellant prepared inflated or fictitious invoices, those alleged acts also constituted breach of contract claims insofar as they were pleaded as an element of the breach of contract causes of action emanating from the purported failure of the corporate entities to perform in accordance with the subject contracts, thereby earning "unjustified fees."])

Further, the fraud claim is dismissed against all defendants to the extent that plaintiffs allege that defendants entered the contract with the present intention of not performing. (*Bencivenga & Co. v Phyfe*, 210 AD2d 22, 22 [1st Dept 1994] ["A cause of action based upon breach of contract cannot be converted into one for fraud merely by alleging that defendants did not intend to fulfill the contract."]; *Glenn Partition, Inc. v Trustees of Columbia Univ. in City of New York*, 169 AD2d 488, 489 [1st Dept 1991]

[finding fraud claims "legally deficient because they relied upon alleged misrepresentations of future intent".]) The record, including testimony, documents, and photos, is clear that defendants did in fact perform, albeit below plaintiffs' expectations which would constitute a breach of contract. (NYSCEF 389, Highline Progress Reports at 1-21 [demonstrating the construction conditions when Highline took over the project]; NYSCEF 383, project emails.)

In the absence of proof of plaintiffs' unsuccessful search for an assumed name certificate, the court rejects plaintiffs' alternative basis for fraud – that defendants' State Insurance Fund certificate of Workers' Compensation Insurance in the name of "Best & Company Construction Services, LLC" is fraudulent because it is a corporation with no employees. (NYSCEF 352, Contract exhibit at 53, Workers Compensation Certificate.)

However, as the court has previously determined, plaintiffs have alleged fraud to the extent that Ferraioli and Brian diverted Project funds to their own use, for purposes unrelated to the Project and to the detriment of the Project. (NYSCEF 300, Second Amended Complaint ¶¶ 72-77; NYSCEF 296, Decision; NYSCEF 318, Motion sequence 003, tr at 7:1-5.)

> "[T]o the extent that it is alleged that the corporation or its principals embezzled or diverted funds for their own use or for purposes unrelated to the project, and that they acted to conceal this purported diversion, the [complaint] adequately states a cause of action for fraud." (*Delta Dallas Omega Corp.*, 189 AD2d at 702 [citation omitted].)

Since Ferraioli and Brian are both corporate officers and agents of DDNYC, they could be personally liable for their own torts such as fraud by embezzlement. That Ferraioli did not sign the AIA contract is irrelevant for the purposes of a tort claim for fraud.

> "'Corporate officers or agents are personally liable for those torts they personally commit, or which they inspire or participate in, even though performed in the

name of an artificial body.' . . . [C]orporate officers 'are not liable for nonfeasance; they are liable for misfeasance, or malfeasance.'" (*Michaels v Lispenard Holding Corp.*, 11 AD2d 12, 14 [1st Dept 1960] [citation omitted].)

For example, a principal officer of a corporation may be held liable in his individual capacity for a tort, such as negligence or trespass, if he personally worked on each house in the development that had water drainage problems. (*Kopec v Hempstead Gardens, Inc.*, 264 AD2d 714, 716 [2d Dept 1999].) A corporate landlord's officer could be personally liable in a lead paint case where he allegedly misled a tenant by saying there had been no lead paint used for ten years. (*Espinosa v Rand*, 24 AD3d 102, 102-103 [1st Dept 2005].) In another lead paint case, the 50% shareholder and president of the corporate landlord could be personally liable for negligence because he inspected building apartments for lead and hired workers to abate lead, but illness from lead paint persisted. (*Peguero v 601 Realty Corp.*, 58 AD3d 556, 560 [1st Dept 2009].)

To establish fraud against all defendants, plaintiffs must prove "a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." (*Centro Empresarial Cempresa S.A. v Am. Movil, S.A.B. de C.V.*, 17 NY3d 269, 276 [2011] [citation omitted].) Eliciting payments from a homeowner for the purpose of construction or renovation to pay subcontractors, but instead embezzling or diverting the funds for personal use, constitutes fraud. (*Yablon v Stern*, 161 AD3d 594, 594 [1st Dept 2018].) Thus, the question is whether defendants diverted or embezzled funds for the Project while continuing to bill plaintiffs, knowing that the work was either not done or done improperly.

Blass testified for plaintiffs that the scope of his engagement was "to determine if [DDNYC] used the Fraga payments totaling $3,401,272 in an appropriate manor [sic], for specific contracted improvements to their apartment ... [or] diverted for other purposes, during 2018 and 2019" and "[t]o determine if evidence indicates that DDNYC deliberately and intentionally ended operations in 2019." (NYSCEF 446, Blass tr aff ¶¶ 1-2.) In the absence of any documentary evidence otherwise, the court is compelled to find that defendants acted in such a manner.

The court rejects defendants' objection that Blass's presentation fails to consider DDNYC's other projects. While there was testimony as to other simultaneous large projects, (*see, e.g.,* NYSCEF 566, Brian June 16, 2022 deposition tr 361-368; NYSCEF 568, Ferraioli June 17, 2022 deposition tr 10:15-20), the absence of documentary evidence is fatal. Defendants failed to produce requested documents which would explain whether these transfers were used for DDNYC's construction projects. (NYSCEF 461, Blass Report; NYSCEF 575, Fitzhugh tr 97:4-11.) Likewise, the court finds that Brian essentially admitted that he considered business entities that had common ownership, such as DDNYC, Bespoke, Opus, and Mill House Coffee House, Inc. to be under the same financial umbrella, implying that he ignored corporate formalities. (NYSCEF 566, Brian June 16, 2022, deposition tr 327:20-23, 328:18-329:4.) While Brian testified that DDNYC appropriately tracked intercompany transactions, his testimony is insufficient without documents that were requested but never produced to corroborate his testimony.

However, plaintiffs fail to offer any evidence to satisfy the other elements of fraud. "Where a fraud has been committed there follows a liability of the guilty party for

[* 23]

the damages created by the fraud." (*A.G. Hyde & Sons v Lesser*, 93 AD 320, 322 [1st Dept 1904].)  Here, plaintiffs assert damages for breach of contract – the amount paid to Highline to fix DDNYC's breaches.  Fraud damages are different, and plaintiffs make no attempt to establish them.  "[F]raud damages are meant to redress a different harm than damages on a cause of action for breach of contract. Contract damages are meant to restore the nonbreaching party to as good a position as it would have been in had the contract been performed; fraud damages are meant to indemnify losses suffered as a result of the fraudulent inducement.  Where all of the damages are remedied through the contract claim, the fraud claim is duplicative and must be dismissed."
*(MBIA Ins. Corp. v Credit Suisse Sec. (USA) LLC*, 165 AD3d 108, 114 [1st Dept 2018] [citations omitted].)  Plaintiffs' evidence that defendants used less skilled workers and that DDNYC decreased its workforce, which slowed down the progress of the Project, is not quantified.  Moreover, plaintiffs fail to offer any testimony on reliance, a pivotal element for fraud.

Plaintiffs' request for punitive damages is denied.  (NYSCEF 579, Plaintiffs' Conclusions of Law at 19; NYSCEF 300, SAC ¶49.)  Plaintiffs withdrew their second cause of action in which the punitive damages claim is embedded.

At the close of plaintiffs' case, defendants moved to dismiss.  The court reserved decision which is now granted as to plaintiffs' claims which are insufficient as a matter of law and factually lacking as well, as discussed below.

DDNYC's unjust enrichment claim and defendants' attorneys' fees claim are dismissed.  Unjust enrichment is a "quasi contract" claim, which "only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal

obligation imposed in order to prevent a party's unjust enrichment." (*Clark-Fitzpatrick, Inc.*, 70 NY2d 382, 388 [1987].)  There is no dispute that the parties had contract which precludes unjust enrichment.  Finally, attorneys' fees are not available to the contractor under this contract and defendants fail to provide any other legal basis.  (*See* NYSCEF 352, Contract § 8.12.)

## Findings of Fact

1. Based on Fraga's testimony, the court finds that in November 2018, the project was nearing a "wonderful result" with a few open items including radiator covers, closet doors, and painting.  There were deficiencies, but defendants were not given a sufficient opportunity to cure because of a lack of cooperation by plaintiffs' design team.  The court finds that plaintiffs design team subsequently exaggerated defendants' deficiencies.  Therefore, plaintiff's claim for breach of contract is dismissed because plaintiffs breached first; plaintiffs have not established their own performance.

2. Since Fraga and defendants, as parties, are interested witnesses, the court gave their testimony the skepticism that it was due.  (PJI Civil 1:25C.)

3. Bavolek's request for defendants' notice of completion contradicts plaintiff's objection that defendants' notice of completion was premature. With the premature notice of completion, Bavolek admittedly intended to trick the coop into believing that the project was near completion, when it was not, or the project was near completion.  Either way, Bevelok's testimony is unreliable.

4. The court finds that Blaney and Bavolek are interested witnesses whose bias influenced their testimony.  (*See* PJI Civil §1:92.)  As discussed above, Blaney's testimony was contradicted by documentary evidence and inconsistent.  Bavolek had reason to blame defendants because he failed to properly oversee the Project as plaintiff's representative.  Blaney too failed to fulfill her role as designer because she admittedly failed to check if design items were delivered and installed.  (NYSCEF 572, Blaney tr 101:19-106:7.)  Instead, she blamed defendants for double billing.  (*Id.*)  DDNYC was not responsible for such problems after it was paid for its work long before and was off the Project.  It was Bavolek's job to timely monitor the Project and, for example, inspect the floor and subflooring before the floor is installed and before paying DDNYC.  Indeed, most of the plaintiffs' complaints can be traced to Bavolek's failure to fulfill his responsibilities as the owners' representative and his failure to timely notify defendants of issues and give defendants an opportunity to cure in real time, as required by the contract, instead of paying defendants without complaint before finding deficiencies.

5. Fraga alerted Bavolek in July of her concern that the work was slowing down such that the Project would not be complete by September, the deadline set in the contract and as required by the coop. However, Bavolek did nothing more than email defendants until November when he called in Smith, the architect, and directed defendants to file a premature Notice of Substantial Completion.

6. The court credits Ferraioli's testimony that the powder room wall was closed temporarily because plaintiffs were moving in after which the plumber would return to finish and Ferriaoli discussed this plan with Bavolek. (NYSCEF 576, Ferraioli tr 24:16.) Blaney was plaintiff's primary witness to address this issue, but her testimony was exaggerated and unreliable. Blaney's July photo, not an x-ray, of the wall eight months earlier is inconclusive. Moreover, she was not privy to the conversation with Bavolek which may have occurred in July, two months prior to the original end date when plaintiffs would be expected to take occupancy. (NYSCEF 576, Ferraioli tr 22:1-24:16; 532, photo; NYSCEF 576, Blaney tr 115:18-117:3.)

7. Plaintiffs' contention that the apartment was not habitable is belied by the facts, including photos. Indeed, on February 21, 2019, plaintiffs took occupancy. (NYSCEF 576, Blaney tr 115:25; 116:1; NYSCEF 576, Ferraioli tr 115:25; 116:1; NYSCER 444, Brian tr aff ¶¶ 14, 16; NYSCEF 573, Bavelok tr 83:10-12; 89:10-15.)

8. The court finds that plaintiffs were aware that DDNYC used the tradename Best & Company NYC beginning April 24, 2018 when the DOB application was prefiled. (See NYSCEF 290, DOB Permit.) The court rejects plaintiffs' testimony otherwise and finds that such testimony undermines the credibility of plaintiffs' witnesses who testified otherwise.

9. The court rejects plaintiffs' assertion that defendants hid Brian's relationship with Bespoke, the millwork facility of which Brian was 55% owner, and which performed millwork for the Project. Plaintiffs were well aware of the connection between the companies since the start of the Project. (NYSCEF 447, Bavolek tr aff ¶15.) Plantiffs' assertion undermines their position and the credibility of witness testimony otherwise.

10. To the extent the project was delayed, the court finds that plaintiffs contributed to such delay. Bavolek admitted that there were various decisions that needed to be made by plaintiffs, but they failed to do so timely e.g. selecting paint colors and finishes. (NYSCEF 573, Bavolek tr 40:9-16.) Indeed, as of December 13, 2018, plaintiffs had yet to make such selections. (NYSCEF 437, Smith's list of outstanding items, signed by Bavolek.) Timothy testified such delays persisted during Highline's part of the project.

[* 26]

11. The January 19, 2019 punch list was unreliable because it is contradicted by the earlier draft wherein Smith acknowledged that DDNYC completed some items that were listed as incomplete on the January 19, 2019 punch list.

12. On April 4, 2019, plaintiffs' counsel sent DDNYC a letter terminating the Contract, again, which included the January 16, 2019 punch list, a new list of alleged defective work and a new list of materials allegedly not delivered to the Project. Blaney created the list of undelivered materials in March 2019. Since defendants were already off the Project, they had no opportunity to cure these deficiencies. During the summer of 2023, Blaney prepared yet another list but never provided it to defendants. (NYSCEF 382, Blaney's list of contract materials and services; NYSCEF 572, Blaney tr 101:19:25; 102:1-7; 103:9-11; 104:23-25; 105:20-23; 576:11-18). Such testimony and evidence prepared for litigation cannot be the basis for a finding against defendants because the lists were not given to defendants and they had no opportunity to cure.

13. Based on the adverse inference, the court finds that DDNYC's labor force was unskilled. Had the documents been retained and produced by defendants, as they should have been, they would show who DDNYC employed, when, and their hours. (NYSCEF 461, Blass tr aff ¶¶107, 116-123.) As to any damage caused by such workers, however, the court cannot comprehend how Bavolek, Blaney, and Smith, plaintiffs' design team, failed to notice that the workers were unskilled, that the work was not performed skillfully, and that the workers caused damage instead. Nonetheless, plaintiffs continued to pay defendants. Therefore, the adverse inference is of no consequence on plaintiff's claim.

14. In the absence of the Procure documents, the court is compelled to conclude that the workforce was depleted at a time that there was more work to be done. Accordingly, defendants forfeit the $79,233.73 remaining due to defendants on the contract.

15. There is no evidentiary support in the record for defendants' claim for payment of $107,339.73 arising from work performed January 1, 2019 to February 28, 2019.

16. Defendants are not due $109,185.29 which was admittedly not paid to subcontractors.

[* 27]

Accordingly, it is

ORDERED that the complaint is dismissed against all defendants; and it is further

ORDERED that defendants' counterclaims are dismissed.

DATE: **10/27/2024**

ANDREA MASLEY, JSC

**Check One:** ☒ Case Disposed | ☐ Non-Final Disposition

**Check if Appropriate:** ☐ Other (Specify _____ )