Crane v WP Strategic Holdings, LLC (2025 NY Slip Op 52064(U))

[*1]

Crane v WP Strategic Holdings, LLC

2025 NY Slip Op 52064(U)

Decided on September 10, 2025

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 10, 2025
Supreme Court, Albany County

Douglas A. Crane and DAVID W. CRANE, Plaintiffs,

against
WP Strategic Holdings, LLC, TODD KLETTER, TODD A. SLINGERLAND and ADAM M. NEARY, Defendants.

Index No. 903035-25

O'Connell & Aronowitz P.C.
Attorneys for Plaintiff
(Daniel J. Tuczinski, of counsel)
54 State Street, 9th Floor
Albany, New York 12207
Wilson Elser Moskowitz Edelman & Dicker, LLP
Attorneys for Defendants
(Peter A. Lauricella and Kadeem O. Wolliaston, of counsel)
200 Great Oaks Boulevard, Suite 228
Albany, New York 12203

Richard M. Platkin, J.

Plaintiffs Douglas A. Crane and David W. Crane bring this action to (i) set aside a release given to defendant WP Strategic Holdings, LLC ("WP") and its members, defendants Todd Kletter, Todd A. Slingerland and Adam M. Neary, and (ii) recover damages for claims falling within the scope of the release. In lieu of answering, defendants move under CPLR 3211 (a) (1), (5) and (7) to dismiss plaintiffs' complaint as barred by the release.
BACKGROUND [FN1]

In February 2024, plaintiffs entered into discussions with Todd Kletter, WP's managing member, "to partner together for the purchase of a Delaware corporation known as Crane Special Papers North America, Inc. ['CSPNA'] from the entity that owned said corporation (the 'Seller')" (NYSCEF Doc No. 1 ["Complaint"], ¶ 8; see id., ¶¶ 9-17). 
Plaintiffs each contributed $300,000 towards the acquisition, with the funds deposited into an escrow account maintained by the parties' transactional counsel, the law firm of Cohen Kinne Valicenti & Cook LLP ("Cohen Kinne") (see id., ¶¶ 12-16). In exchange for their contribution of capital, plaintiffs each expected to "receive 10% of the stock of [CSPNA], and Kletter confirmed such understanding in his response to Cohen Kinne regarding the assignment of [CSPNA's] stock" (id., ¶¶ 17-19). 
At the March 14, 2024 closing on CSPNA's shares ("Closing"), Kletter allegedly informed plaintiffs that, "to facilitate the purchase . . . as soon as possible, the stock purchase agreement would show WP as the purchaser and that WP and Plaintiffs would later document the fact that each Plaintiff was the owner of 10% of [CSPNA's] stock" (id., ¶¶ 21-22). "[I]n reliance on said statements and promises made by Kletter, Plaintiffs agreed and authorized that the $600,000 . . . be released from escrow by Cohen Kinne and paid to the Seller toward the [$3 million] purchase price" (id., ¶ 23; see also NYSCEF Doc No. 21 ["Douglas Aff."], ¶¶ 17-21). 
"Immediately after the Closing, a shareholder meeting of [CSPNA] was held, at which . . . each of the Plaintiffs and Kletter were elected as directors and officers" (Complaint, ¶¶ 27-28). 
A few days later, in response to an inquiry from counsel regarding allocation of the CSPNA shares, "Kletter specifically acknowledged in writing that Plaintiffs' investment resulted in an '80/20 split,'" with plaintiffs having a combined 20% ownership (id., ¶¶ 29-30; see NYSCEF Doc No. 43). "Notwithstanding [such] agreement, no stock certificates were issued to either of the Plaintiffs" (Complaint, ¶ 31; see also id., ¶¶ 35-36).
"Unbeknownst to Plaintiffs, on or around March 6, 2024, and prior to the Closing, Kletter and WP were negotiating with . . . Perfect Cube LLC d/b/a Decree Company of Raleigh, North Carolina ('Decree') to sell the stock of [CSPNA] to Decree for approximately $9,750,000" (id., ¶ 32). On May 17, 2024, Decree and WP executed a letter of intent ("LOI") for the transaction (see id., ¶¶ 33-34; see also Douglas Aff., ¶¶ 29-30; NYSCEF Doc No. 38 [LOI]). 
After signing the LOI, defendants "abruptly changed their position with respect to Plaintiffs' ownership interests in [CSPNA]" (Douglas Aff., ¶ 34). On May 28, 2024, after plaintiffs inquired about the lack of documentation, Kletter informed plaintiffs that the parties "had different views on, among other things, their ownership interests in [CSPNA] and that their short- and long-term goals were no longer aligned" (id.; see Complaint, ¶ 37). Kletter offered to "return" the $600,000 in capital contributed by plaintiffs, together with an additional $60,000 "to address any inconvenience" (NYSCEF Doc No. 39; see Douglas Aff., ¶ 34; Complaint, ¶ 37). 
"Although [plaintiffs] knew that the parties had agreed that [they] collectively had a 20% interest in [CSPNA], [plaintiffs] reluctantly agreed to Defendants' proposal because the amount offered was relatively close to what [they] had been led to believe was the value of [CSPNA], i.e., $3 million" (Douglas Aff., ¶ 35). However, Kletter "fail[ed] . . . to inform [plaintiffs] that WP . . . had already entered into the [LOI] on May 17, 2024, to sell the stock of [CSPNA] for $9,750,000" (id., ¶ 36). "Plaintiffs would each have been entitled to $975,000 of that amount as 10% shareholders" (id.; see Complaint, ¶ 39). 
"[A]round June 3, 2024, Kletter presented Plaintiffs with a proposed Agreement and Mutual Release (the 'Release') that was drafted by Defendants' new attorney and insisted that [*2]Plaintiffs sign [the Release] as a condition of receiving" $330,000 each (Douglas Aff., ¶ 37). 
"Plaintiffs shared the proposed Release with [their now-independent counsel, Cohen Kinne], and, after [their counsel] and Defendants' new attorney made several revisions, Plaintiffs, WP, [CSPNA] and Kletter signed the Release, . . . and Plaintiffs were paid $330,000 each" (id.; see Complaint, ¶ 40; NYSCEF Doc No. 11 [Release]). 
The Release began with the following recitations:
WHEREAS, on or about March 14, 2024, WP Strategic entered into a certain "Stock Purchase Agreement" with Fredrigoni S.P.A. and CSPNA whereby WP Strategic purchased all of the Capital Stock of CSPNA (the "Crane Stock Acquisition") for the purchase price in the amount of three million and 00/100 ($3,000,000) Dollars . . . ;
WHEREAS, based upon conversations among the Crane Parties and Kletter, the Crane Parties each contributed to WP Strategic three hundred thousand and 00/100 ($300,000) Dollars for what the Crane Parties believed would be for the purchase of shares of CSPNA Capital Stock ("CSPNA Shares") on terms to be agreed upon with Kletter after the Closing of the Crane Stock Acquisition, including, a right of first refusal should WP Strategic sell any CSPNA Shares;
WHEREAS, the Parties have been unable to reach agreement on the terms on which the Crane Parties would hold a percentage of CSPNA Shares and have agreed to (a) terminate negotiations in that regard, and (b) have WP Strategic refund the Crane Parties' contributions of six hundred thousand and 00/100 ($600,000) Dollars (the "Crane Amount") and pay them an additional sixty thousand and 00/100 ($60,000) Dollars in full settlement of this matter, all on the terms set forth herein;
WHEREAS, an agreement now exists between the WP Parties and the Crane Parties about how to resolve their disagreement and the Parties would like to resolve this matter . . . (Release at 1-2). To resolve the dispute, the parties agreed that defendants would make a $660,000 payment to plaintiffs, and plaintiffs would release Kletter, CSPNA, WP and its members, "jointly and severally, from any and all claims, rights, causes of action, suits, debts, dues, units, shares, stock, interests, sums of money, . . . , and all liability and obligations for the same, in law or in equity, whether contingent or fixed, known or unknown, . . . that [plaintiffs] ever had, now have, or hereafter . . . may have . . . by reason of any matter, cause or thing, from the beginning of the world until the date of this [Release]" (id., ¶ 4 [emphasis added]). 
Plaintiffs affirmatively represented that they "entered into this [Release] of their own free will and accord, have received independent legal counsel and review of this [Release], and they have not been promised any additional future consideration with respect to the transactions contemplated by this [Release]" (id., ¶ 2; see also id., ¶ 7). Plaintiffs further acknowledged the "unconditional[]" nature of the Release and expressly recognized the prospect that WP "could sell the CSPNA Shares at any time in the future" without accounting to plaintiffs for the profits (id., ¶ 4 [emphasis added]). "Despite this possibility, [plaintiffs] knowingly and voluntarily provide[d] [the] Release" and gave up any claim to ownership of CSPNA's shares (id.).
About one month later, on July 3, 2024, Decree acquired CSPNA through merger for a [*3]purchase price of $9,750,000 (see Complaint, ¶ 47; NYSCEF Doc No. 46).[FN2]

In January 2025, Decree's principal supplied plaintiffs with documents showing that Kletter had been negotiating the sale of CSPNA to Decree in March 2024 (see Douglas Aff., ¶ 28; NYSCEF Doc Nos. 35-37).[FN3]

Plaintiffs commenced this action on March 26, 2025, alleging that defendants breached their agreement "to issue stock certificates and documentation . . . to evidence [plaintiffs'] collective 20% ownership of the [CSPNA] stock . . . , as previously agreed upon [with Kletter], because they were actively negotiating and preparing to sell the stock" to Decree (Complaint, ¶ 35; see id., ¶¶ 22, 25-26, 43). 
Plaintiffs further allege that defendants failed to inform them "that Kletter and WP had been negotiating with Decree . . . or that Kletter and WP had entered into the [LOI]" (id., ¶ 42). "From the time of the Closing until the time of the execution of the Release, Kletter confirmed that each of the Plaintiffs owned 10% of [CSPNA's] stock" (id., ¶ 43). "From the point in time that the agreement was made on March 12, 2024, that Plaintiffs would collectively be 20% shareholders of [CSPNA] and at all times thereafter, Defendants were fiduciaries with each of the Plaintiffs" (id., ¶ 45). Defendants allegedly violated their fiduciary duties to plaintiffs by "deliberately withh[olding] . . . information regarding" the LOI (id., ¶ 46). 
Plaintiffs now seek to set aside the Release as the product of fraud, arguing that they would not have signed the Release if they had known that defendants "negotiated a sale of [CSPNA] for [$9.75 million]" (id., ¶ 56). Plaintiffs also seek to recover 20% of the $9.75 million paid by Decree for CSPNA, together with interest and punitive damages, under theories sounding in fraud, breach of fiduciary duty, unjust enrichment, constructive trust and breach of contract.
Defendants move to dismiss the Complaint under CPLR 3211 (a) (1), (5) and (7), arguing that all of plaintiffs' causes of action are foreclosed by the clear and unambiguous language of the Release, which was negotiated and signed by commercial parties represented by counsel. Plaintiffs acknowledged in the Release that: (i) there never was a mutual agreement with respect to their ownership of CSPNA's shares; (ii) all negotiations directed at the issue of ownership were terminated; and (iii) plaintiff released defendants from any and all liabilities and obligations, including claims for "shares, stock, interests [and] sums of money" (Release, ¶ 4).
"Even accepting Plaintiffs' allegations as true, the Complaint fails as a matter of law" because plaintiffs "admit they never received stock certificates, never entered into a written agreement confirming ownership, and were aware of a dispute regarding their alleged interest in CSPNA before signing the [Release]. Their attempt to void the [Release] based on alleged fraudulent nondisclosure of a potential third-party sale fails under binding precedent, as the asserted nondisclosure does not amount to fraud sufficient to vitiate a negotiated release —particularly where, as here, the parties expressly resolved a known dispute over ownership, and no misrepresentation was alleged to have been made" (NYSCEF Doc No. 14 at 2). 
Plaintiffs oppose dismissal, arguing that "the allegations of the complaint, together with the proof submitted . . . in opposition to the motion, show that they have stated a valid cause of action to set aside the [R]elease because it was procured by fraud" (NYSCEF Doc No. 48 at 1). 
DISCUSSION
A. Legal Standards
On a motion to dismiss under CPLR 3211 (a) (7), the court's "sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law[,] a motion for dismissal will fail" (Polonetsky v Better Homes Depot, 97 NY2d 46, 54 [2001] [internal quotation marks and citation omitted]). Dismissal "is warranted if the plaintiff fails to assert facts in support of an element of the claim, or if the factual allegations and inferences to be drawn from them do not allow for an enforceable right of recovery" (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017]).
"Under CPLR 3211 (a) (1), dismissal is warranted if documentary evidence conclusively establishes a defense as a matter of law" (Haire v Bonelli, 57 AD3d 1354, 1356 [3d Dept 2008] [citations omitted]).
CPLR 3211 (a) (5) authorizes dismissal where the movant establishes that "[a] cause of action may not be maintained because of [a] . . . release" (CPLR 3211 [a] [5]).
"Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release" (Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 17 NY3d 269, 276 [2011] [internal quotation marks and quotation omitted]). Where the language of a release "is clear and unambiguous," the signing of the release "is a 'jural act' binding on the parties" (Booth v 3669 Delaware, 92 NY2d 934, 935 [1998], quoting Mangini v McClurg, 24 NY2d 556, 563 [1969]). 
"A release may be invalidated, however, for any of 'the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake'" (Centro, 17 NY3d at 276, quoting Mangini, 24 NY2d at 563). "Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release 'shifts the burden of going forward . . . to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release'" (id., quoting Fleming v Ponziani, 24 NY2d 105, 111 [1969]). 
"A plaintiff seeking to invalidate a release due to fraudulent inducement must 'establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury" (id., quoting Global Mins. & Metals Corp. v Holme, 35 AD3d 93, 98 [1st Dept 2006]). 
"Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is 'fairly and knowingly made'" (id., quoting Mangini, 24 NY2d at 566-567). And "a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release" (id. at 567 [internal citation omitted]).
B. Analysis
Defendants support the motion with the Release signed by plaintiffs, wherein they [*4]voluntarily relinquished their disputed claim to an ownership interest in CSPNA in exchange for a full refund of their original capital investment and a 10% premium (see Release, ¶ 4).
In assenting to the Release, plaintiffs acknowledged that their acquisition of CSPNA's shares was subject to "terms to be agreed upon with Kletter after the Closing" (id., second Whereas Clause), and the parties were unable to reach mutual agreement on "the terms [by] which [plaintiffs] would hold a percentage of CSPNA Shares" (id., third Whereas Clause). 
Given the impasse, plaintiffs "agreed to terminate negotiations" directed at establishing an ownership interest and, instead, elected to "resolve their disagreement" by obtaining the return of their capital investment ($600,000) along with a 10% premium ($60,000) (id., third and fourth Whereas Clauses). 
In exchange, plaintiffs released WP, its members, CSPNA and Kletter individually from "any and all claims, rights, causes of action . . . shares, stock, interests, sums of money . . . , and all liability and obligations for the same in law or in equity, whether contingent or fixed, known or unknown" (id., ¶ 4). 
Plaintiffs confirmed that the Release was given "unconditionally," and WP could sell its CSPNA shares "at any time" without liability (id.). "Despite this possibility" (id.), plaintiffs executed the Release "of their own free will and accord, have received independent legal counsel and . . . have not been promised any additional future consideration" (id., ¶ 2). 
The Court concludes that defendants have demonstrated, prima facie, that plaintiffs' claims are barred by the Release, thereby shifting the burden to plaintiffs to demonstrate its invalidity.
Plaintiffs maintain that the Release was procured by fraud, arguing that defendants "had a duty to disclose to [them] the information about the sale to Decree, including . . . the [LOI], because they were in a fiduciary relationship with Plaintiffs . . . and also pursuant to the special facts doctrine" (NYSCEF Doc No. 48 at 16-17).
"[A] release that . . . extinguishes liability on any and all claims arising in connection with specified matters is deemed to encompass claims of fraud relating to those matters, even if the release does not specifically refer to fraud" (Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 76 AD3d 310, 318-319 [1st Dept 2010], affd 17 NY3d 269 [2011], citing Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 544 F Supp 2d 178, 192 [SD NY 2008]). 
Here, following the parties' inability to agree on the terms by which plaintiffs would acquire an interest in CSPNA, plaintiffs "knowingly and voluntarily" released defendants from any liabilities or obligations, "whether contingent or fixed, known or unknown," for "shares, stock, interests [or] sums of money" (Release, ¶ 4). Thus, the Release encompasses unknown fraud claims, thereby precluding a claim of fraudulent inducement "unless the release was itself induced by a separate fraud" (Cento Empresarial, 17 NY3d at 277 [emphasis added]).
No such separate fraud has been identified here. The claim of fraudulent inducement is based on defendants' alleged fiduciary concealment of information concerning the LOI and the potential sale of CSPNA to Decree (see Complaint, ¶¶ 53-54, 63-64), but this is just an extension of plaintiffs' over-arching complaint: that defendants refused to accord them the rights and privileges attendant to an ownership interest in CSPNA, notwithstanding Kletter's express promises of the same (see id., ¶¶ 109-111). In essence, plaintiffs are "asking to be relieved of the release on the ground that they did not realize the true value of the claims they were giving up" (Centro, 17 NY3d at 277 [internal quotation marks omitted]; see Pappas v Tzolis, 20 NY3d [*5]228, 233-234 [2012]; Avnet, Inc. v Deloitte Consulting LLP, 187 AD3d 430, 431 [1st Dept 2020]).
And even if plaintiffs had adequately identified a separate fraud, their claim that they were "fraudulently induced to sign the release would still fail" (Avnet, 187 AD3d at 431). 
Plaintiffs argue that they were owed a fiduciary duty of disclosure by reason of their status as shareholders and directors of CSPNA (see Complaint, ¶¶ 50-51, 61-62). However, any claim that plaintiffs were shareholders of CSPNA is conclusively refuted by the Release and plaintiffs' acknowledgement therein that the parties were unable to reach mutual agreement "on the terms on which [plaintiffs] would hold" CSPNA's shares (Release, third Whereas Clause; see also id., ¶ 4).[FN4]

Plaintiffs further allege that they, along with Kletter, were elected as directors of CSPNA at a meeting held immediately after the Closing (see Complaint, ¶¶ 27-28). Even accepting the truth of this highly-implausible and unsupported assertion,[FN5]
"[f]ellow directors of a corporation . . . do not owe fiduciary duties to one another" (Sternklar v Sternklar-Worenklein, 2024 NY Misc LEXIS 66760, *39 [Sup Ct, NY County 2024]).
But even if plaintiffs were owed fiduciary duties as shareholders or directors, their claim of fraudulent inducement fails for lack of justifiable reliance. Parties claiming fraud cannot establish "reasonable reliance . . . where, as here, [they have] the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fail[] to make use of those means" (Arfa, 76 AD3d at 59 [internal quotation marks and citations omitted]; see Centro, 17 NY3d at 279; Lusins v Cohen, 49 AD3d 1015, 1017 [3d Dept 2008]).[FN6]

Plaintiffs are sophisticated businesspeople who were represented by their own separate counsel at pertinent times (see Complaint, ¶¶ 8, 12, 29; Douglas Aff., ¶¶ 2, 37; Release, ¶¶ 2, 7), including during arm's-length negotiations with defendants' counsel over the terms of the Release (see NYSCEF Doc No. 51). "A sophisticated principal is able to release its fiduciary from claims — at least where, as here, the fiduciary relationship is no longer one of unquestioning [*6]trust — so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into" (Centro, 17 NY3d at 278 [citations omitted]; see Kafa Invs., LLC v 2170-2178 Broadway LLC, 114 AD3d 433, 433 [1st Dept 2014] [Feinman, J., on panel] ["That defendants arguably are fiduciaries of plaintiffs does not invalidate the release, since they negotiated across the table from plaintiffs, who are sophisticated parties represented by counsel."], lv denied 24 NY3d 902 [2014]).
In this regard, Kletter allegedly promised to "document . . . that each Plaintiff was the owner of 10% of [CSPNA's] stock" (Complaint, ¶ 22). Notwithstanding "numerous requests" by plaintiffs (Douglas Aff., ¶ 27), defendants "refused to issue [the promised] stock certificates and documentation to Plaintiffs" (Complaint, ¶ 35). 
Then, more than "two (2) months after the Closing," defendants "abruptly changed their position" regarding plaintiffs' involvement (NYSCEF Doc No. 48 at 10). Despite prior promises to the contrary, defendants explicitly refused to grant plaintiffs an ownership interest in CSPNA, and they also put plaintiffs on notice that the parties' "short- and long-term goals were no longer aligned" (Complaint, ¶ 37). In fact, defendants' suspicious and "unresponsive nature after the March 14, 2024, Zoom Meeting," led one of plaintiffs' advisors to recommend that they accept defendants' settlement proposal because he believed that "Kletter was being untruthful" (NYSCEF Doc No. 25, ¶ 24).
Despite all of these red flags, settlement negotiations conducted at arm's length through separate counsel, and a proposed Release that recognized WP's right to sell CSPNA shares "at any time" without accounting to plaintiffs (Release, ¶ 4), plaintiffs made no inquiry concerning the value of their claimed interest in CSPNA or the reasons for defendants' "abrupt[]" change in position. Plaintiffs did not inquire about the status of CSPNA's business, the prospects for a sale of CSPNA's stock, or the value of their claimed 20% ownership interest (see Arfa, 76 AD3d at 59; Jana L., 22 AD3d at 278).[FN7]

Instead, plaintiffs "knowingly and voluntarily" executed the Release based on their "belief" that the $660,000 they would receive from defendants was "relatively close" to the market value of the interest they claimed in CSPNA (Douglas Aff., ¶ 35; accord NYSCEF Doc No. 22, ¶ 30). In so doing, plaintiffs disregarded overt conduct on the part of defendants clearly evincing a breakdown in the relationship and an adversarial posture, including a clear statement that defendants no longer viewed the parties' interests as being aligned (see Complaint, ¶ 37).
"Where a principal and fiduciary are sophisticated parties engaged in negotiations to terminate their relationship, . . . the principal cannot blindly trust the fiduciary's assertions. This is particularly true where . . . the principal has actual knowledge that its fiduciary is not being entirely forthright" (Centro, 17 NY3d at 279; see Pappas, 20 NY3d at 232 ["Where a principal and fiduciary are sophisticated entities and their relationship is not one of trust, the principal cannot reasonably rely on the fiduciary without making additional inquiry."]).[FN8]

Here, plaintiffs repeatedly and unsuccessfully attempted to hold defendants to their [*7]promise of an ownership interest in CSPNA before abandoning their claims and giving "an extraordinarily broad release" in exchange for payment of $660,000 (Centro, 17 NY3d at 278). "They cannot now invalidate that release by claiming ignorance of the depth of their [alleged] fiduciary's misconduct" (id.).
The Court therefore concludes that plaintiffs' failure to conduct any diligence as to the value of their released claims conclusively defeats the allegation that they reasonably and justifiably relied upon defendants' silence regarding the non-binding LOI [FN9]
and other information bearing on the value of their claimed interest in CSPNA. "The need to use care to reach an independent assessment of the value of [CSPNA and the released claims] should have been obvious to plaintiffs" and their counsel under the circumstances presented in their Complaint and affidavits in opposition to the motion (Pappas, 20 NY3d at 233).
CONCLUSION
Accordingly, it is
ORDERED that defendants' motion to dismiss is granted; and it is further
ORDERED that plaintiffs' complaint is dismissed as barred by the Release.
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for defendants shall promptly serve notice of entry on all parties entitled thereto.
Dated: September 10, 2025
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1, 9-14, 21-48, 50-52, 54.

Footnotes

Footnote 1:The following facts are drawn from the complaint, as amplified by the fact affidavits submitted by defendants in opposition to the motion (see Leon v Martinez, 84 NY2d 83, 88 [1994]).

Footnote 2:Decree later sued WP in this Court regarding post-closing adjustments (see Matter of Decree-Crane Special Papers NA, LLC v WP Strategic Holdings, LLC, 85 Misc 3d 1276[A], 2025 NY Slip Op 50725[U] [Sup Ct, Albany County 2025]). 

Footnote 3:This gave rise to a second lawsuit between WP and Decree (see Index No. 905069-25).

Footnote 4:Although recitals in a contract "form no part thereof," they do "indicate . . . the purposes and motives of the parties" (Ross v Ross, 233 App Div 626, 635 [1st Dept 1931], affd sub nom. Hutchison v Ross, 262 NY 381 [1933]; accord Genovese Drug Stores, Inc. v Connecticut Packing Co., Inc., 732 F2d 286, 291 [2d Cir 1984]).

Footnote 5:As defendants observe, it strains credulity to believe that WP, which contributed 80% of the capital to purchase CSPNA, would have given control of the board of directors to minority investors (see e.g. NYSCEF Doc No. 23 ["Cook Aff."], ¶ 21). Moreover, there is no allegation or evidence that defendants ever treated plaintiffs as directors. And the only evidentiary support for plaintiffs' claim of having been elected as directors comes from an unauthenticated email allegedly prepared by a Cohen Kinne paralegal (see Douglas Aff., ¶ 20, citing NYSCEF Doc No. 42; accord Cook Aff., ¶ 16).

Footnote 6:The "special facts" doctrine similarly requires plaintiff to establish that the information "was not such that could have been discovered by [plaintiff] through the exercise of ordinary intelligence" (Jana L. v West 129th St. Realty Corp., 22 AD3d 274, 278 [1st Dept 2005] [internal quotation marks and citations omitted]).

Footnote 7:Plaintiffs claim to have been directors of CSPNA, but they do not allege that they made any inquiries concerning CSPNA's business in that capacity. In fact, plaintiffs make no claim to having taken any official actions during their alleged tenure as directors.

Footnote 8:Plaintiffs do not allege any affirmative misrepresentation by defendants, only silence (see Complaint, ¶¶ 53, 57, 63).

Footnote 9:Only the exclusivity and confidentiality provisions of the LOI were binding upon WP and CSPNA (see LOI, ¶¶ 7, 9).